IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

JACQUES DEGAULE

CRIMINAL CASE NO.

1:10-CR-0162-RWS-RGV

## ORDER FOR SERVICE OF FINAL REPORT, RECOMMENDATION, AND ORDER

Attached is the Final Report, Recommendation, and Order of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and N.D. Ga. Cr. R. 58.1(A)(3)(a) and (b).  Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of receipt of this Order.  Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party.  The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court.  Failure to object to this Report and Recommendation waives a party's right to review.  Fed. R. Crim. P. 59(b)(2).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(F), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED** and **DIRECTED**, this 22nd day of April, 2011.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

JACQUES DEGAULE

CRIMINAL CASE NO.
1:10-CR-0162-RWS-RGV

**MAGISTRATE JUDGE'S FINAL REPORT, RECOMMENDATION,
AND ORDER ON DEFENDANT'S PRETRIAL MOTIONS**

Defendant Jacques Degaule ("Degaule") is charged along with co-defendants Jiles Delwin Johnson ("J. Johnson"), Shannon Renee Johnson ("S. Johnson"), Mark Lamont Walker ("Walker"), Schawn Lemon Wortham ("Wortham"), Thallas Amie ("Amie"), and Laverne Simon ("Simon"), in a three-count superseding indictment. [Doc. 13]. Specifically, Degaule is charged in Count Two of the superseding indictment with conspiring to launder drug trafficking proceeds in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i)-(ii), and (h). [Id.].[1] Pending before the Court are Degaule's motion for disclosure of confidential informants, [Doc. 145], motion to suppress intercepted communications, [Doc. 144], and motions to suppress evidence and statements, [Docs. 146 & 206].[2] The pending motions have been fully

---

[1] The superseding indictment also includes a forfeiture provision. [Doc. 13].

[2] Degaule moves to suppress all evidence and statements arising from his June 17, 2010, arrest and the subsequent search of, among other things, his residence.

briefed, and are ready for ruling.  For the following reasons, Degaule's motion for disclosure of confidential informants, [Doc. 145], is **DENIED**, and it is hereby **RECOMMENDED** that his motion to suppress intercepted communications, [Doc. 144], and motions to suppress evidence and statements, [Docs. 146 & 206], be **DENIED**.

## I.  DISCUSSION

### A.   <u>Motion to Suppress Intercepted Communications, [Doc. 144]</u>

Degaule moves to suppress evidence obtained as a result of four wiretap orders, [Doc. 144], which the government opposes, [Docs. 213 & 215].  For the reasons set forth herein, it is hereby **RECOMMENDED** that Degaule's motion to suppress, [Doc. 144], be **DENIED**.

---

[Docs. 146 & 206].  On November 30, 2010, the Court held an evidentiary hearing on Degaule's motions to suppress evidence and statements, <u>see</u> [Doc. 248 (transcript of the evidentiary hearing)], and the government submitted exhibits during the hearing, which will be referred to as "(Degaule Gov. Ex. ___)."  Degaule subsequently moved to reopen the record in order to supplement government's Exhibit 1 with an additional document, <u>see</u> [Doc. 273-1 at 2-4], that was not tendered as part of that exhibit, [Doc. 278], and he also asked for oral argument on all pending motions, [Doc. 279].  The Court granted the motion to reopen the record and admitted, without objection from the government, Defendant's Exhibit 1, an affidavit by Degaule, (Def. Ex. 1 (Degaule Aff.)), and accepted the government's proffer of testimony regarding the exhibit, without objection from Degaule.  [Doc. 291].  Having heard argument from counsel at the hearing on the motion to reopen the record, and the parties having fully briefed the pending motions, Degaule's request for oral argument, [Doc. 279], is **DENIED**.

## 1.    Introduction

### a.    *Statutory Framework for Intercepted Communications*

"Title III of The Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.

§§ 2510-2520, sets forth numerous requirements the government must meet before

electronic surveillance (wiretaps) may be authorized."  United States v. Flores, No.

1:05-cr-558-WSD-JFK, 2007 WL 2904109, at *21 (N.D. Ga. Sept. 27, 2007), adopted at

*15.  For example, pursuant to 18 U.S.C. § 2518, a wiretap application must include:

> a full and complete statement of the facts and circumstances relied
> upon by the applicant . . . including details as to the particular offense
> . . ., a particular description of . . . the type of communications sought
> to be intercepted, the identity of the person . . . whose communications
> are to be intercepted, and a full and complete statement as to whether
> or not other investigative procedures have been tried and failed or why
> they reasonably appear to be unlikely to succeed if tried or to be too
> dangerous.

United States v. Gonzalez Perez, 283 Fed. App. 716, 720 (11th Cir. 2008) (per curiam)

(unpublished) (quoting 18 U.S.C. § 2518(1)(b), (c)) (internal marks omitted)

(alterations in original).  See also United States v. Woodley, No. CR408-315, 2009 WL

3415214, at *1 (S.D. Ga. Oct. 22, 2009), adopted at *1.

Upon a proper application, a district judge may issue an *ex parte* order

authorizing the interception of wire communications if: "the judge finds probable

cause to believe that an individual is committing or has committed a qualifying

offense; that particular communications concerning that offense will be obtained

3

through such interception; and that the facilities from which, or the place where, the communications are to be intercepted are being used in connection with the offense, or are leased to, listed in the name of, or commonly used by such person." United States v. Duarte-Rosales, Criminal File No. 1:05-CR-197-6-TWT, 2008 WL 140665, at *2 (N.D. Ga. Jan. 11, 2008), adopted at *1 (citing 18 U.S.C. § 2518(3)(a), (b) and (d)). See also United States v. Robles, 283 Fed. App. 726, 734-35 (11th Cir. 2008) (per curiam) (unpublished). "Probable cause for a wiretap is the same probable cause required for a search warrant," Duarte-Rosales, 2008 WL 140665, at *2, and "[l]ike other types of warrants, probable cause must exist at the time surveillance is authorized," Flores, 2007 WL 2904109, at *21 (citing United States v. Domme, 753 F.2d 950, 953 (11th Cir. 1985)). "[A] wiretap order is presumed to be valid, and a defendant has the burden of overcoming the presumption and of proving that the wiretap order was unlawfully obtained." Id. at *22 (citations omitted). "This Court need merely determine whether the judge who signed the warrant had a substantial basis for concluding that probable cause existed." Duarte-Rosales, 2008 WL 140665, at *2 (citations omitted).

    **b.**   *The Wiretap Applications and Supporting Affidavits*

        **i.**    **Initial Wiretap Application for Target Telephone 1**

On November 20, 2009, upon an application and 109-page affidavit submitted

by Drug Enforcement Administration ("DEA") Special Agent Mario Lijoi ("Agent Lijoi"), the Honorable Richard W. Story ("Judge Story"), United States District Judge, entered an order authorizing the interception of wire communications over Target Telephone 1 ("TT1"), which was described as a U.S. Sprint cellular phone (assigned the telephone number of (678) 414-5114) subscribed to S. Johnson, and believed to have been used by J. Johnson.  See [Ex. A attached under seal to the government's consolidated response].[3]  The order also authorized the receipt of location data for TT1 pursuant to Federal Rule of Criminal Procedure 41.  [Ex. A, Order at 7-8].

In his affidavit in support of the application for the wiretap, Agent Lijoi provided background information regarding the investigation of drug trafficking and money laundering activities of a specific drug trafficking organization ("DTO"), which began in October of 2007.  [Ex. A, Lijoi Aff. at 12-81].[4]  Agent Lijoi relayed that based on "seizures of drugs and drug proceeds, debriefings of confidential sources, phone toll analysis, bank record analysis, travel records analysis, credit card

---

[3] The Order named, among others, J. Johnson, S. Johnson, Walker, Amie, Degaule, and Wortham as targets of the investigation.  [Ex. A, Order at 1].

[4] Agent Lijoi averred that he had been with the DEA for twelve years, and had specific experience and training in investigating narcotics trafficking and money laundering organizations, including having participated in numerous federal wiretap investigations.  [Ex. A, Lijoi Aff. at 1-7].

5

expenditures analysis, public record searches, surveillances and other investigative techniques," he had discovered that the DTO was headed up by an Atlanta-based cocaine supplier, who regularly supplied narcotics to the Kansas City and Philadelphia areas. [Id. at 12-13]. Specifically, Agent Lijoi explained that in October of 2007, a confidential source of information ("CSI-1"), identified J. Johnson as the DTO's cocaine supplier. [Id. at 14-15]. CSI-1 explained that this DTO supplied at least three dealers in the Kansas City area, and that it utilized semi-trucks attached to semi-trailers to transport the drugs to Kansas City. [Id.].[5] CSI-1 also identified by name a specific Kansas City dealer that the DTO regularly supplied with cocaine. [Id.].

In April of 2008, law enforcement agents seized a large amount of cocaine in the Philadelphia area, which was subsequently linked to the DTO. [Id. at 35]. Investigation during this seizure showed that the DTO had supplied cell phones to the distributors to be used during the specific deals or loads, and that these "load-phones" were pre-programmed with the DTO supplier's contact information, which was listed as "me." [Id.].[6] Phone records from this time period showed that these

_____

[5] Agent Lijoi explained that the semi-trucks attached to semi-trailers were believed to be registered to an Atlanta business belonging to J. Johnson. [Ex. A, Lijoi Aff. at 14-15].

[6] Agent Lijoi explained that while the load phones were activated only for specific deals and then deactivated, the DTO supplier would maintain an anchor cell

load phones were in contact with each other, and that in the days leading up to and right after the seizure in Philadelphia, TT1 was in contact with individuals believed to be the couriers in Kansas City, among others. [Id. at 36-37]. Additionally, subpoenaed travel and financial records confirmed that the DTO supplier continued to travel to the Philadelphia area after this seizure of cocaine. [Id. at 38-39].

Agent Lijoi relayed that in July 2008, a cooperating source, who had been arrested in New York on narcotics-related charges, explained that the DTO had supplied him with cocaine for distribution in the past, and that it had also supplied another individual with cocaine for distribution in Philadelphia. [Id. at 30-31, 34]. Corroborating this information, Agent Lijoi explained that a confidential source of information ("CSI-2") provided detailed information regarding the DTO supplying cocaine in Philadelphia, and the DTO's supplier providing push-to-talk load phones pre-programmed with the contact "me" for use during the deals. [Id. at 37-38].

Agent Lijoi also relayed that in August 2008, another cooperating source, who had been arrested in Kansas City on narcotics-related charges, explained that the DTO had supplied him, as well as other distributors in the area, with cocaine in the past. [Id. at 19]. This source further explained that the DTO provided "load-phones" with a push-to-talk feature that were pre-programmed with the DTO

_____

phone, such as TT1, to communicate with various members of the DTO regardless of the activation status of the load phones. [Ex. A, Lijoi Aff. at 12-74].

supplier's contact information as "me." [Id. at 19-20]. Additionally, the source explained that the DTO utilized semi-trucks attached with semi-trailers to transport the narcotics to Kansas City, and that on at least one occasion, the source had observed cocaine being removed from one of these semi-trucks. [Id.]. The source said that the DTO utilized at least two couriers, one whom the source identified by name, in the Kansas City area, and that these couriers would actually deliver the cocaine to distributors and then collect the proceeds. [Id.].

Travel records, financial records, phone records, and surveillance showed that the DTO supplier was in fact in Kansas City on various dates between June and August of 2008, and that there were communications between the cooperating source's and the DTO supplier's load-phones, as well as communications between TT1 and the alleged courier identified by the cooperating source. [Id. at 19-20, 22].[7] Indeed, Agent Lijoi explained that "[s]ubpoenaed credit card records, rental car

_____

[7] During this time, TT1 also had contact with a phone subscribed to Degaule, and subpoenaed bank records revealed that between February 2008 and April 2009, Degaule deposited approximately $6.4 million in cash into several bank accounts held in his name or the name of one of his various businesses. Travel records, financial records, phone records, and surveillance corroborated this information. [Ex. A, Lijoi Aff. at 23, 39, 41-43]. These deposits took place in Georgia, Kansas City, Philadelphia, and New Jersey, and the majority of the funds were subsequently transferred to J. Johnson, to J. Johnson's businesses, or to third party creditors on behalf of J. Johnson or his businesses. [Id.]. Travel and financial records confirmed that J. Johnson and Degaule were in Kansas City in July and early August 2008, and that TT1 had contact with Degaule during this time. [Id. at 24-25].

records, airline records, and hotel records revealed a pattern of travel consistent with [the DTO's supplier] traveling from Atlanta, Georgia, to Kansas City, Philadelphia and elsewhere." [Id. at 18, 32]. In particular, the records showed at least 50 trips to Kansas City and 21 trips to Philadelphia, and at least one trip in December of 2008 to Mexico, leaving and returning within three days. [Id. at 18-19, 43-44]. Records revealed that TT1 had contact with telephone numbers in Mexico in December 2008, and also had continued contact with suspected members of the DTO. [Id. at 44].

Agent Lijoi further relayed that in September of 2008, another confidential source of information ("CSI-3") reported that a large shipment of powder cocaine had arrived in Philadelphia from Atlanta. [Id. at 39-40]. At this time, CSI-3 reported observing vehicles in the Philadelphia area that were associated with the DTO's Atlanta-based supplier. [Id.]. Thereafter, in October 2008, an individual was arrested on narcotics-related charges, and at the time of his arrest, he had several cellular telephones with him, one of which contained an entry labeled "me." [Id. at 27-28]. Phone records during this time frame revealed that there was contact between load phones belonging to this individual and a load phone believed to belong to the DTO supplier. [Id. at 28-29]. Additionally, there were contacts on TT1 to other individuals, including one of the alleged Kansas City couriers. [Id. at 29]. Finally, phone records and cell tower utilization showed that TT1 continued to have

contact with suspected members of the DTO, including Degaule, in March, August, September, October, and November of 2009.  [Id. at 44, 46, 48, 50-51, 53-56, 66].[8]

Based on these facts, Agent Lijoi explained that the interception of TT1 was necessary in order to accomplish the goals of the investigation, which included discovering: (a) the identities of all of the members of the DTO and money laundering network beyond those already discovered; (b)the locations of the target subjects and their unidentified accomplices; (c) the scope of the DTO in Atlanta, Kansas City, Philadelphia, and elsewhere; (d)the methods used for the shipment of drugs and collection of proceeds; (e) the identities of the DTO's customers in Atlanta, the other cities involved, and elsewhere; (f) stash house locations; (g) the identities of the DTO's chain of command and customers so that it could be dismantled; and (h) the identity of the DTO's source of supply, its operations, and its scope of distribution.  [Id. at 81-82].[9]  Agent Lijoi then explained that while the use of traditional investigative techniques, including obtaining court authorized toll and cell site information for TT1, conducting physical surveillance, using administrative subpoenas, utilizing confidential sources, and using tracking devices,

---

[8] In fact, Agent Lijoi explained that TT1 was in contact with Degaule 50 times from October 4 through November 3, 2009.  [Ex. A, Lijoi Aff. at 75, 78].

[9] Agent Lijoi also explained that he believed that the geographic location or global positioning satellite ("GPS") data information of TT1 would lead to evidence of the criminal offenses at issue.  [Ex. A, Lijoi Aff. at 74].

had yielded some information, they had yet to be fully successful in accomplishing the goals of the investigation.  [Id. at 83-86, 88-99, 104-05].  Moreover, Agent Lijoi explained why the contemplated use of other investigative methods, including the use of grand jury subpoenas, undercover agents, consensual monitoring, interviews of witnesses or subjects, and search warrants, consent searches, and trash searches were expected to be unsuccessful.  [Id. at 96-97, 99-105].  Agent Lijoi finally explained that the government would conduct the wiretap so as to minimize the interception of communications on TT1.  [Id. at 105-08].

## ii.      Application for First Extension of Wiretap of TT1

On December 22, 2009, the Honorable Timothy C. Batten, Sr. ("Judge Batten"), United States District Judge, signed an order authorizing the extension of the interception of wire communications over TT1 and receipt of information regarding the location and travels of TT1 based on an application and 84-page affidavit submitted by Agent Lijoi.  [Ex. B attached under seal to the government's consolidated response].  In addition to including some of the information provided in his affidavit in support of the initial application for the wiretap of TT1, Agent Lijoi described in detail information obtained as a result of the interception of communications on TT1 authorized on November 20, 2009. [Ex. B, Lijoi Aff. at 13-14].

11

Specifically, Agent Lijoi explained that the intercepted communications confirmed that TT1 was being used as a contact or anchor phone for the DTO. [Id. at 14-47]. In particular, Agent Lijoi described conversations and calls made between TT1 and various individuals, including Degaule, believed to be associated with the DTO, which led him to conclude that these individuals were conspiring to engage in drug trafficking and money laundering activities. [Id. at 14-49].[10] For example, intercepted communications revealed discussions about moving large sums of money through bank accounts, and coded conversations were believed to be consistent with arranging for the use of commercial trucks to transport narcotics. [Id.]. Additionally, intercepted conversations also indicated that the DTO was attempting to move large sums of money internationally, consistent with bank fraud activities. [Id.].

Based on the additional information obtained as a result of the intercepted communications on TT1, Agent Lijoi explained that the continued interception of TT1 was necessary because surveillance of the suspected DTO members had been unsuccessful since the members often met in isolated areas, and that it was only through the intercepted communications that the agents could discern their activities. [Id. at 54]. Additionally, Agent Lijoi relayed that the intercepted

---

[10] Agent Lijoi explained that TT1 was in contact with Degaule 21 times from November 8 through December 15, 2009. [Ex. B, Lijoi Aff. at 49-51].

12

communications revealed a "complex methodology for laundering money involving international bank accounts that if not for the interception of [TT1], the level of sophistication would not have been learned." [Id.].  Agent Lijoi then explained why the traditional methods of investigations would not work to accomplish some of the goals of the investigation established in his original affidavit.  [Id. at 54-79].  Agent Lijoi finally explained that the government would conduct the wiretap so as to minimize the continued interception of communications on TT1.  [Id. at 79-83].

### iii.    Application for Second Extension of Wiretap of TT1

On January 28, 2010, the Honorable Thomas W. Thrash, Jr. ("Judge Thrash"), United States District Judge, signed an order authorizing a second extension of the interception of wire communications over TT1 and receipt of information regarding the location and travels of TT1 based on an application and 73-page affidavit submitted by Agent Lijoi.  [Ex. C attached under seal to the government's consolidated response].  In addition to including some of the information provided in his previous affidavits, Agent Lijoi included in his affidavit in support of the second extension information obtained as a result of further intercepted communications on TT1 from December 23, 2009, through January 20, 2010.  [Ex. C, Lijoi Aff. at 13-14].  Specifically, Agent Lijoi explained that the intercepted communications confirmed that TT1 was still being used as a contact or anchor

13

phone for the DTO.  [Id. at 15-23, 27, 35].  For example, Agent Lijoi described conversations and calls made between TT1 and various individuals, including Degaule, believed to be associated with drug trafficking and money laundering activities.  [Id. at 15-23, 27-34].[11]

Based on the additional information obtained as a result of the continued interception of communications on TT1, Agent Lijoi explained that the interception of TT1 was still necessary in order to accomplish the goals of the investigation.  [Id. at 36, 38-39].  In particular, Agent Lijoi explained that he believed that the continued interception of communications would lead to information concerning the DTO supplier's "efforts to secure a new loan of illegal narcotics for which he appears to be positioning himself through the acquisition of a new semi-truck and trailer, and through his discussions about possible trucking routes."  [Id. at 39].  Additionally, Agent Lijoi explained that he believed that information would be obtained that would allow him to "identify the new replacement 'load-phone' to [TT2], upon which it is believed that [the DTO supplier] has detailed conversations related to his drug trafficking, money laundering and bank fraud activities."  [Id. (emphasis omitted)].  He then explained why traditional methods of investigation would not

_____

[11] Agent Lijoi further explained that he also believed that the DTO supplier was utilizing another phone, Target Telephone 2 ("TT2"), to discuss in detail information he was not willing to discuss on TT1.  [Ex. C, Lijoi Aff. at 21 n.5, 38].

work to accomplish all of the goals of the investigation. [Id. at 40-69]. Finally, Agent Lijoi explained that the government would conduct the wiretap so as to minimize the continued interception of communications on TT1. [Id. at 69-72].

### iv.   Initial Wiretap Application for Target Telephone 7

On May 28, 2010, Judge Batten entered an order authorizing the interception of wire communications over Target Telephone 7 ("TT7") based on an application and 84-page affidavit submitted by Agent Lijoi. [Ex. D attached under seal to the government's consolidated response]. In addition to including the information contained in his prior affidavits, Agent Lijoi explained in detail the relationship between the various load phones and anchor phones used to support the DTO's activities. [Ex. D, Lijoi Aff. at 15-37].

Specifically, Agent Lijoi explained that phone records showed the interrelationship between TT1 and TT2, but that when the use of TT2 started to diminish, toll analysis led to the identification of Target Telephone 3 ("TT3"), which was activated on January 5, 2010, and used as a replacement for TT2 in conjunction with anchor phone TT1. [Id. at 13-26, 32]. When activity on TT3 began to decline, toll analysis again led to the identity of Target Telephone 4 ("TT4"), which was activated on March 11, 2010, as the replacement phone. [Id. at 26-28]. Agent Lijoi explained that just as TT2 and TT3 had been used in conjunction with then existing

15

anchor phone TT1, it was determined that TT4 was being used with the replacement anchor phone, Target Telephone 8 ("TT8").  [Id. at 27].  Activity on TT4 began to decline on March 21, 2010, and reverse toll analysis then led to the identification of TT7, which was activated on April 16, 2010.  [Id. at 28-29, 38, 41].  Agent Lijoi further explained that based on the analysis of TT7 as the most recent replacement load phone for the DTO supplier, he believed that the DTO supplier would "coordinate the distribution of [the] expected cocaine load through the use of [TT7]."  [Id. at 38-39].[12]

Agent Lijoi then explained why traditional methods of investigation would not work to accomplish the goals of the investigation established in his original affidavit.  [Id. at 46-55, 58-80].  Finally, Agent Lijoi explained that the government would conduct the wiretap so as to minimize the interception of communications on TT7.  [Id. at 80-83].

## 2.  Analysis

Degaule seeks to suppress all evidence obtained as a result of the four wiretaps, arguing that the law enforcement agents failed to minimize the intrusion on the target telephones and that the affidavits in support of the wiretap applications fail to establish probable cause or to meet the necessity requirement.

---

[12] Agent Lijoi also explained that TT7 was in contact with Degaule 23 times from April 16 through May 10, 2010.  [Ex. D, Lijoi Aff. at 41, 43-44].

He requests a necessity evidentiary hearing for the wiretaps, and a <u>Franks</u>[13] hearing regarding the references to confidential sources in the affidavits utilized in support of the wiretap applications.  [Docs. 144 & 235].[14]  Degaule also seeks suppression of evidence secured through the use of the target phones' geographic location and GPS data information.  [Doc. 164].[15]  The Court will address each of these arguments in

---

[13] <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

[14] "In order to contest an order permitting the interception of communications, a defendant must establish that he was an 'aggrieved person.'"  <u>United States v. Ortega-Estrada</u>, Criminal File No. 1:07-CR-356-TWT, 2008 WL 4716949, at *2 (N.D. Ga. Oct. 22, 2008), adopted at *1 (quoting 18 U.S.C. § 2518(10)(a)).  "Such a person is defined in the relevant statute as a 'person who was a party to an intercepted . . . communication or a person against whom the interception was directed.'"  <u>Id.</u> (quoting 18 U.S.C. § 2510(11)).  Degaule contends he has standing since he was listed as a target on each of the wiretap applications filed by the government.  [Doc. 144 at 3-4; Doc. 235 at 2].  In response, the government notes that to the extent Degaule concedes that "he is a listed target subject for which the wiretap efforts were directed . . . standing has been established."  [<u>Id.</u> at 9-10].  Accordingly, the Court finds that Degaule has standing to challenge the wiretap orders at issue.

[15] Degaule seeks the production of unredacted investigative reports and the production of any wiretap progress reports submitted to the Court.  [Doc. 144 at 2-3; Doc. 235 at 3-7].  Degaule, however, "has made no particularized showing of need" for this information, and to the extent he seeks material pursuant to the Jencks Act, 18 U.S.C. § 3500, "[t]here is no authority for the Court to grant an early release or disclosure of that material."  <u>United States v. White</u>, No. CR 109-073, 2009 WL 3486057, at *3 (S.D. Ga. Oct. 27, 2009).  <u>See also</u> <u>United States v. Jones</u>, No. 1:05-cr-617-WSD, 2007 WL 2071267, at *14 (N.D. Ga. July 19, 2007), adopted at *3-4 ("The Jencks Act materials . . . are not subject to disclosure until the government witness testifies at trial on direct examination, or earlier if the government agrees.") (citations omitted).  Furthermore, although Degaule seeks the production of the wiretap progress reports, "progress reports primarily constitute summaries of interceptions and therefore do not provide any statements or exculpatory material

17

turn.[16]

### a.   *Probable Cause*

"To support an order of electronic surveillance, an affidavit must establish, among other things, probable cause to believe that an individual is committing, has committed, or is about to commit certain offenses enumerated in 18 U.S.C. § 2516, and probable cause to believe that communications concerning that offense will be obtained through electronic surveillance."  United States v. Peterson, 627 F. Supp. 2d 1359, 1363 (M.D. Ga. 2008) (citation omitted).  "The probable cause necessary to

_____

not also required to be disclosed in its original form."  United States v. Chimera, 201 F.R.D. 72, 77 (W.D.N.Y. 2001) (internal marks and citation omitted).  "Thus, if the intercepted communications contain exculpatory information, [Degaule] either already [has], or will have, access to it in sufficient time to use it in [his] defense."  Id.  Moreover, "there is no basis to find any reasonable likelihood the attorney for the Government or the agents who prepared and filed the progress reports included information tending to exculpate [Degaule]," and Degaule has "not offered any such reason."  [Id.].  Thus, "there is no basis to find that the reports will yield information material to the defense in this case."  Id.; see also United States v. Arnett, No. 04-CR-285, 2005 WL 6111778, at *8 (E.D. Wis. Apr. 13, 2005).

[16] Although the government argues that Degaule has "failed to sufficiently perfect [his] motions or otherwise delineate [his] arguments for this Court's consideration in most, if not all, of the sections of [his] motions, [Doc. 213 at 11], the Court will address the merits of Degaule's arguments.  See United States v. Rice, Criminal Action No. 09-91-DLB-JGW, 2010 WL 1418425, at *3 (E.D. Ky. Mar. 17, 2010), adopted by 2010 WL 1418424, at *1 (E.D. Ky. Apr. 6, 2010) (noting that while defendant's "arguments challenging the wiretap orders are arguably so conclusory that they do not merit this court's detailed review of the supporting affidavits," "out of an abundance of caution," the court would undertake a detailed review of each of the two initial wiretap orders, the three continuations of the orders, and the underlying affidavits supporting the orders).

support a wiretap authorization is the same probable cause necessary for a search warrant." Id. (citing United States v. Nixon, 918 F.2d 895, 900 (11th Cir. 1990)). See also Gonzalez Perez, 283 Fed. App. at 721. "Thus, probable cause exists if the totality of the circumstances indicate that there is a fair probability that the sought for evidence will be obtained." Peterson, 627 F. Supp. at 1363 (citing Illinois v. Gates, 462 U.S. 213, 239 (1983)). "The probable cause determination of the judge who issued the wiretap order will be upheld if the judge had a 'substantial basis' for concluding that probable cause existed." Id. (citing Nixon, 918 F.2d at 900).

Contrary to Degaule's contentions, Agent Lijoi's affidavits alleged sufficient facts to establish probable cause to intercept communications over TT1 and TT7. Indeed, "[a] drug smuggling conspiracy of wide scope and long standing is described in some detail, and it is alleged that the telephone[s] sought to be tapped [were] used in furtherance of the conspiracy." United States v. Hyde, 574 F.2d 856, 862 (5th Cir. 1978).[17] Specifically, Agent Lijoi recited information regarding the DEA's investigation of the DTO that began in October of 2007. [Ex. A, Lijoi Aff. at 14; Ex. B, Lijoi Aff. at 13; Ex. C, Lijoi Aff. at 13; Ex. D, Lijoi Aff. at 13]. Agent Lijoi recounted specific information in his affidavits that linked the use of TT1 and TT7

---

[17] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

to a drug trafficking organization.  In particular, Agent Lijoi explained how the DTO utilized load phones in combination with an anchor phone, and described how the investigation led to the identity of TT1 as an anchor phone being used by the DTO's Atlanta-based cocaine supplier for the Kansas City and Philadelphia areas.  [Ex. A, Lijoi Aff. at 12-14].  Confidential sources, financial records, phone records, travel records, surveillance, and the seizure of several load phones confirmed this information, [id. at 18-20, 22-25, 27-31, 34-44], and "[t]hese traditional standards, then, all give the affidavit some degree of reliability, buttressing a finding of probable cause therefrom," Hyde, 574 F.2d at 863.

Additionally, Agent Lijoi explained how TT1 had contact with previously seized load phones and continued to have contact with suspected members of the DTO in a manner consistent with drug trafficking and money laundering activities. [Ex. A, Lijoi Aff. at 43-67].  As load phones were deactivated, the investigation showed that TT1 continued to be used as the anchor phone with newly identified load phones.  [Id.].  "'[W]iretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation.'" United States v. Stokes, No. 96 CR. 481 (SAS), 1996 WL 727400, at *5 (S.D.N.Y. Dec. 18, 1996) (quoting United States v. Steinberg, 525 F.2d 1126, 1130 (2d Cir. 1975)). Therefore, Judge Story, who issued the order authorizing the initial wiretap,

reasonably concluded based on the facts contained in the affidavit that there was probable cause to believe that information and evidence concerning drug trafficking and money laundering activities would be obtained through the interception of wire communications over TT1. [Ex. A, Order at 2-3].

After the initial authorization of the wiretap of TT1, the intercepted communications confirmed that TT1 was being used as an anchor phone for the DTO. [Ex. B, Lijoi Aff. at 14-47; Ex. C, Lijoi Aff. at 15-23, 27, 35]. Additionally, Agent Lijoi explained that intercepted conversations revealed discussions about moving large sums of money through various bank accounts and arranging for the use of commercial trucks to transport narcotics, which was corroborated through other sources, and upon which Judges Batten and Thrash reasonably found probable cause warranting two extensions of the interception of communications over TT1. [Ex. B, Lijoi Aff. at 14-49; Ex. B, Order; see also Ex. C, Lijoi Aff. at 15-23, 27-34, 39; Ex. C, Order].

Subsequently, through the use of these intercepted communications, cell tower utilization, surveillance, and phone records, Agent Lijoi explained that TT7 was identified as the new load phone for the DTO, and Judge Batten, who issued the order authorizing the wiretap, reasonably concluded based on the facts contained in the affidavit that there was probable cause to believe that information and

evidence concerning drug trafficking and money laundering activities would be obtained through the interception of wire communications over TT7.  [Ex. D, Lijoi Aff. at 13-39; Ex. D, Order at 2-3].  See United States v. Eiland, 398 F. Supp. 2d 160, 171 (D.D.C. 2005) (finding probable cause for wiretap where affidavit relied on confidential sources, physical surveillance, and previously captured calls to show that defendant was using the target phone to conduct drug trafficking related activities).

In his attempt to challenge Agent Lijoi's affidavit for lack of probable cause, Degaule asserts that the toll analysis/pen register sections "fail to provide sufficient information to establish probable cause."  [Doc. 144 at 12].  In support of this argument, Degaule, citing to paragraphs 106 and 107 of Agent Lijoi's affidavit in support of the initial wiretap application for TT1 and paragraphs 72 and 73 of Agent Lijoi's affidavit in support of the wiretap for TT7, states, "[t]here are only two pages in each affidavit dedicated to this area, and neither suffices to show probable cause." [Id.].  Degaule's argument, however, overlooks the fact that Agent Lijoi actually devoted eight pages in his original affidavit and five pages in his affidavit in support of the first extension to the toll analysis of TT1, and six pages in his affidavit in support of the wiretap for TT7 to the toll analysis of TT7.  [Ex. A, Lijoi Aff. at 74-81 ¶¶ 94-95; Ex. B, Lijoi Aff. at 49-53 ¶¶ 89-98; Ex. D, Lijoi Aff. at 41-46 ¶ 55].  In fact,

22

the paragraphs Degaule cites were actually utilized under the sections in Agent Lijoi's affidavits describing the necessity for the wiretaps at issue.  See [Ex. A, Lijoi Aff. at 81-89 ¶¶ 96-107; Ex. D, Lijoi Aff. at 46-60 ¶¶ 56-73].  More important, the toll analysis was not the sole factor upon which probable cause was based.  As previously explained, confidential sources, financial records, travel records, surveillance, and the seizure of several load phones in combination with the toll analysis confirmed that TT1 and TT7 were being used in support of the DTO's activities.  Therefore, Degaule's argument in this regard is without merit.

Degaule also asserts that the information contained in the affidavit as it pertains to him, was "stale and not incriminatory."  [Doc. 235 at 8].  Specifically, Degaule argues that while Agent Lijoi explains how he discovered that Degaule had made several large deposits, which he then in turn paid out to many creditors or third parties on behalf of J. Johnson's businesses, he "neglects to mention . . . that [Degaule] . . . submitted 1099s for many, if not all, of these payments," and "did not attempt to hide his financial role on behalf of [J. Johnson's] legitimate businesses." [Id.].  Therefore, Degaule argues that the affidavit failed to establish probable cause that he had committed or was about to commit a crime.  [Id. at 9].

However, "[i]n issuing the wiretap orders regarding [TT1 and TT7], the relevant probable cause inquiry is not whether [Degaule] was engaged in criminal

23

activity but whether *an individual* was engaged in criminal activity and whether the conversations sought to be monitored over the target telephones were likely to contain evidence of a crime." United States v. Diaz, Criminal No. 3:08-CR-267-D (05), 2009 WL 348284, at *5 (N.D. Tex. Feb. 11, 2009). See also United States v. Ambrosio, 898 F. Supp. 177, 184-85 (S.D.N.Y. 1995) ("[T]he relevant inquiry is whether the conversations sought to be monitored were likely to contain evidence of a crime") (citations omitted). That is, "as to those persons who are known to the investigators and listed in the wiretap application, the government need not establish probable cause 'for each person named in an application . . . . What is required is sufficient information so that a judge could find probable cause to believe that the telephone in question is being used in an illegal operation.'" Woodley, 2009 WL 3415214, at *2 (quoting Domme, 753 F.2d at 954 n.2).

Here, Degaule "improperly focus[es] on the investigation of his own conduct while ignoring the larger inquiry into the alleged conspiracy as a whole." United States v. Murdock, No. CR410-160, 2011 WL 43503, at *1 (S.D. Ga. Jan. 6, 2011). As previously discussed, Agent Lijoi's affidavits alleged sufficient facts to establish probable cause to believe that J. Johnson, and others, were part of a conspiracy to distribute narcotics and to launder the proceeds, and that communications regarding these activities would be intercepted over TT1 and TT7. Therefore, the issuing

judges reasonably concluded that there was probable cause to believe that J. Johnson or another individual "was engaged in drug trafficking and that the conversations sought to be monitored over [TT1 and TT7] were likely to contain evidence of drug trafficking–issues that [Degaule] does not challenge." <u>Diaz</u>, 2009 WL 348284, at *6. Thus, "the interception of those telephones was properly authorized, and [Degaule's] calls over those telephones could be monitored so long as the communications were likely to contain evidence of the drug-trafficking [and money laundering] activity being investigated, as was the case." <u>Id.</u>; <u>see also</u> <u>Gonzalez Perez</u>, 283 Fed. App. at 721-22 & n.6.

Finally, Degaule argues that the deposits occurred between February 2008 and April 2009, and that "the last known deposit, which occurred in April, was significantly smaller than the remainder and was the first such deposit made by [Degaule] in almost five months." [Doc. 235 at 9]. Degaule then points out that "no other deposits allegedly attributable to [J. Johnson] were made by [Degaule] between April 2009 and November 2009, the date in which the application for a wiretap application was submitted," and he contends that the information contained in Agent Lijoi's affidavit was therefore stale and should not have been considered in the probable cause analysis. [<u>Id.</u>].

"It is fundamental that the information provided to a judge in the application for a wiretap order, just as for a search warrant, must be timely." United States v. Batiste, No. 06-20373-CR, 2007 WL 2412837, at *17 (S.D. Fla. Aug. 21, 2007) (citing Hyde, 574 F.2d at 864). "That is because probable cause must exist at the time the order issues." Id. (citations omitted). "Whether information submitted in support of a wiretap order is stale is an issue that is decided on the peculiar facts of each case." Id. (citing Hyde, 574 F.2d at 865). "Courts traditionally allow a fairly long period of time to elapse between information and search warrant in cases where the evidence shows a long-standing, on-going pattern of criminal activity." Id. (citation omitted). "This is even more reasonable in wiretap cases than in ordinary search warrant cases, because no tangible objects that can be quickly carried off are sought." Id. (citing United States v. Van Horn, 789 F.2d 1492, 1498-99 (11th Cir. 1986) ("where investigation was of large, on-going drug importation and distribution conspiracy, the fact that the most recent information was two months old did not indicate the probable cause did not exist"); United States v. Ozar, 50 F.3d 1440, 1446 (8th Cir. 1995) ("where FBI was investigating bank fraud conspiracy, passage of time was less significant when there was cause to believe continuing criminal activity")). Furthermore, "[i]t is well established . . . that stale information

is not fatal when . . . updated information corroborates the alleged stale information." Ortega-Estrada, 2008 WL 4716949, at *7 (citation omitted).

Here, the investigation into the DTO's activities had been ongoing since October of 2007. While Degaule may not have made any deposits between April and November of 2009, the affidavit detailed how Degaule remained in contact with TT1 through November 3, 2009, and Agent Lijoi provided updated information concerning other members of the DTO and the DTO's activities up to the date of the application. See [Ex. A, Lijoi Aff. at 12-67, 78]. See also United States v. Thomas, 605 F.3d 300, 310 (6th Cir. 2010) (8-month old evidence not stale where evidence was "refreshed" by more recent corroborating information in the affidavit); United States v. Diaz, 176 F.3d 52, 109-10 (2d Cir. 1999) (pen register analysis updated and bolstered probable cause by showing use of target phone to call members involved in drug trafficking activities within a month of wiretap application). As present in this case, "[w]here the supporting affidavit paints a picture of continuing conduct, as opposed to an isolated instance of wrongdoing, . . . the passage of time between the last described act and the presentation of the application becomes less significant." United States v. Muhammad, Criminal No. 3:09cr265 (JBA), 2010 WL 2232438, at *5 (D. Conn. May 26, 2010) (internal marks and citation omitted) (second alteration in original).   In fact, "[t]he passage of time is not controlling, but is one

factor to consider, along with the length of criminal activity." United States v. Dang, No. 2:08-CR-88, 2009 WL 1918081, at *3 (D. Vt. June 30, 2009) (citation omitted).

"Given the nature of the offenses with which [Degaule has] been charged, and given the incompleteness of [the] plans, it was reasonable for the issuing judges to have concluded that the activities mentioned in the affidavits were of an on-going nature." Batiste, 2007 WL 2412837, at *18. Thus, the information included in Agent Lijoi's affidavit was not stale, and the Court rejects Degaule's argument in this regard. See United States v. Johnson, 290 Fed. App. 214, 223 (11th Cir. 2008) (per curiam) (unpublished) (collecting Eleventh Circuit cases that rejected staleness challenges involving information that was anywhere from six months to two years old); United States v. Rowell, 903 F.2d 899, 903 (2d Cir. 1990) (finding an 18-month delay between informants' statements and the wiretap application did not render information stale); United States v. Word, 806 F.2d 658, 662 (6th Cir. 1986) (four to five month old information in affidavit not stale where, *inter alia*, "the events alleged in the affidavit were of a continuing nature"). See also United States v. Spikes, 158 F.3d 913, 924 (6th Cir. 1998) (evidence up to four years old sufficient to support probable cause where affidavit contained more recent information showing that drug trafficking was of an ongoing and continuing nature).[18] Accordingly, the Court

---

[18] The Court notes that even if the information regarding Degaule was stale, Agent Lijoi's affidavit, as previously discussed, still established probable cause to

finds that the issuing district judges had a substantial basis to conclude that probable cause existed when they authorized the initial and continuing wiretaps at issue in this case.

### b.   *Necessity*

"Pursuant to 18 U.S.C. § 2518, court-ordered electronic surveillance is prohibited unless the government demonstrates the necessity of such techniques." United States v. Wilson, 314 Fed. App. 239, 243 (11th Cir. 2009) (per curiam) (unpublished) (citation omitted). "This statute requires that wiretap applications include a 'full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous . . . .'" United States v. Collins, 300 Fed. App. 663, 666 (11th Cir. 2008) (unpublished) (quoting 18 U.S.C. § 2518(1)(c)). See also Wilson, 314 Fed. App. at 243. "The purpose of this statute is to ensure that wiretapping is not resorted to in situations in which traditional investigative techniques[19] would suffice to expose the crime." Collins, 300 Fed. App. at 666

---

support the wiretap of the target phones. See Rowell, 903 F.2d at 903 (noting that the wiretap was not based solely on informants' statements made approximately 18-months prior to the wiretap application, and that "even without those statements, the . . . affidavit demonstrated probable cause to support the warrant").

[19] "Traditional investigative techniques include: physical surveillance, cooperating witnesses, informants, controlled drug purchases, pen registers and trap and trace devices." Collins, 300 Fed. App. at 666 n.2.

(footnote added).  "'The affidavit need not show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves.'"  Id. (quoting Van Horn, 789 F.2d at 1496).  "The district court is entitled to broad discretion in analyzing the necessity issue, and the government's showing on necessity must be read in a practical and commonsense fashion."[20]  United States v. Newsome, No. CR 108-062, 2008 WL 4820257, at *3 (S.D. Ga. Nov. 4, 2008), adopted at *1 (internal marks and citation omitted).

Degaule contends that the government failed to establish the necessity for the wiretaps at issue in this case and that the fruits of the wiretap orders should therefore be suppressed.  [Docs. 144 & 235].  Specifically, Degaule argues that the wiretap application "conflate[s] the Affiant's belief that there is probable cause to believe some suspects are engaged in criminal conduct, with the particularized necessity for a wiretap," asserting that the government has failed to demonstrate any need for the wiretaps with specificity.  [Doc. 144 at 15].  In short, Degaule contends

_____

[20] "Congress' purpose in conditioning wiretaps upon a showing of necessity was narrow."  United States v. Hammond, No. 2:10-cr-0007-JMS-CMM, 2011 WL 201497, at *5 (S.D. Ind. Jan. 18, 2011).  "Congress wanted to ensure not that wiretaps are used only as a last resort in an investigation, but that they were not to be routinely employed as the initial step in criminal investigation."  Id. (internal marks and citation omitted).  See also United States v. Giordano, 416 U.S. 505, 515 (1974).  Therefore, "the necessity hurdle is not great. . . ."  Hammond, 2011 WL 201497, at *5 (internal marks and citations omitted).

that Agent Lijoi's affidavits merely recite boiler-plate rationales by stating that traditional investigative measures have not been or will not be successful, and that the government has therefore failed to carry its burden of showing a necessity for the wiretaps. [Id. at 15-16]. The Court disagrees.

In his affidavits, Agent Lijoi described at length the two-year long investigation of the DTO in this case and explained that the wiretaps were necessary to accomplish specific objectives of the investigation, which included, *inter alia*, discovering the identities of all of the members of the DTO and money laundering network beyond those already discovered; the locations of the target subjects and their unidentified accomplices; the scope of the DTO in Atlanta, Kansas City, Philadelphia, and elsewhere; the methods used for the shipment of drugs and collection of proceeds; the identities of the DTO's customers in Atlanta, the other cities involved, and elsewhere; stash house locations; the identities of the DTO's chain of command and customers so that it could be dismantled; and the identity of the DTO's source of supply and its operations and scope of distribution. See [Ex. A, Lijoi Aff. at 81-82; Ex. B, Lijoi Aff. at 53-55; Ex. C, Lijoi Aff. at 36-41; Ex. D, Lijoi Aff. at 46-48]. Agent Lijoi then provided a detailed explanation of the techniques already employed and the reasons why these techniques, and others, had failed to achieve the investigation's objectives or why he believed such techniques would fail in this

particular investigation. [Ex. A, Lijoi Aff. at 82-105; Ex. B, Lijoi Aff. at 55-79; Ex. C, Lijoi Aff. at 41-69; Ex. D, Lijoi Aff. at 48-80]. The techniques the government either tried or considered included using pen registers, conducting physical surveillance, utilizing a grand jury, using administrative subpoenas, using confidential sources, utilizing undercover agents, performing consensual monitoring, interviewing witnesses, using search warrants, performing trash searches, and using tracking devices. [Ex. A, Lijoi Aff. at 88-105; Ex. B, Lijoi Aff. at 55-79; Ex. C, Lijoi Aff. at 41-69; Ex. D, Lijoi Aff. at 48-80].

While it is true that an affidavit supporting a wiretap application must "show with specificity why in *this particular investigation* ordinary means of investigation will fail," United States v. Carrazana, 921 F.2d 1557, 1565 (11th Cir. 1991) (internal citations omitted), and that much of the conclusions in Agent Lijoi's affidavits would certainly apply to numerous drug and money laundering conspiracy investigations, such as the ineffectiveness of pen registers and tracking devices, or the fear that a grand jury or interviews with witnesses would alert the conspirators, see [Ex. A, Lijoi Aff. at 88, 96-97, 102, 104-05; Ex. B, Lijoi Aff. at 53-79; Ex. C, Lijoi Aff. at 36-69; Ex. D, Lijoi Aff. at 46-80], the affidavits in question here are sufficiently specific and do not constitute "boiler-plate rationales."

For example, Agent Lijoi explained that counter-surveillance techniques used by the DTO and restricted access to various locations made physical surveillance unlikely to reveal all of the alleged conspirators in this case. [Ex. A, Lijoi Aff. at 89-95; Ex. B, Lijoi Aff. at 62-69; Ex. C, Lijoi Aff. at 48-57; Ex. D, Lijoi Aff. at 60-70]. In fact, the affidavits note that physical surveillance was insufficient due to the number of unknown co-conspirators and the DTO's attempts to elude law enforcement. [Ex. A, Lijoi Aff. at 89-95; Ex. B, Lijoi Aff. at 62-69; Ex. C, Lijoi Aff. at 48-57; Ex. D, Lijoi Aff. at 60-70]. Likewise, the use of pen registers and tracking devices could not lead to the identity of co-conspirators as they only identify the numbers called or the location of the suspects, and attempts to identify the suspects have been often unsuccessful since the phones usually contain false subscriber information and the number of vehicles at the DTO's disposal made identifying the members difficult. [Ex. A, Lijoi Aff. at 88-89, 104-05; Ex. B, Lijoi Aff. at 61-62, 78-79; Ex. C, Lijoi Aff. at 46-47, 67-69; Ex. D, Lijoi Aff. at 58-60, 79-80]. Agent Lijoi also explained that confidential sources, undercover agents, and consensual monitoring were not an option because "[i]t is difficult, if near impossible, for outsiders to penetrate the organization," and the government did not have contacts to get them sufficiently close to the conspiracy's inner core. [Ex. A, Lijoi Aff. at 97-102; Ex. B, Lijoi Aff. at 71-76; Ex. C, Lijoi Aff. at 59-64; Ex. D, Lijoi Aff. at 71-76]. Similarly, Agent Lijoi

explained that using a grand jury investigation, interviewing witnesses or known subjects, and using search warrants would frustrate the broader purpose of the investigation by alerting other members of the DTO and possibly leading to the destruction of evidence.  [Ex. A, Lijoi Aff. at 96, 102-03; Ex. B, Lijoi Aff. at 69-71, 76-78; Ex. C, Lijoi Aff. at 57-59, 64-67; Ex. D, Lijoi Aff. at 70-71, 77-79].  Finally, Agent Lijoi concluded that trash pulls would be unsuccessful given the restricted access to various locations and the counter-surveillance systems that were put into place.  [Ex. A, Lijoi Aff. at 103-04; Ex. B, Lijoi Aff. at 77-78; Ex. C, Lijoi Aff. at 66-67; Ex. D, Lijoi Aff. at 78-79].  Thus, contrary to Degaule's assertions, these are not boilerplate affidavits.  See Murdock, 2011 WL 43503, at *1.  Indeed, "[i]ncluding more than mere general declarations and conclusory statements, [these] affidavit[s] instead incorporate[] detailed facts and supporting conclusions that satisfy the predicates of 18 U.S.C. § 2518(c)."  Id.[21]  Thus, Agent Lijoi's detailed explanation regarding the

---

[21] Degaule also argues that the affidavits are "void on their face and cannot be relied upon" because they did not provide the issuing judges "a full and complete statement regarding other investigative procedures and any alleged danger," but rather, were "afforded specifically tailored information designed to persuade the Court to authorize the taps and extensions."  [Doc. 144 at 14 n.3 (internal marks omitted)].  In support of this argument, Degaule points to Agent Lijoi's statement that "Because this affidavit is being submitted for the limited purpose of seeking authorization for an order authorizing the interception of wire communications on [TT1], I have not set forth each and every fact learned during the course of this investigation."  [Id.; see also Ex. A, Lijoi Aff. at 7-8 ¶ 8].  Degaule's argument, however, ignores Agent Lijoi's entire statement, which shows that he was actually referring to facts sufficient to establish probable cause and not to the necessity

necessity of the wiretaps in order to reach the investigation's objectives is sufficient to satisfy the necessity requirement.[22]

Degaule further contends that "the traditional investigative techniques employed by the police were actually working," contrary to Agent Lijoi's "belief that 'normal investigative procedures appear[ed] reasonably unlikely to succeed in meeting the goals and objectives of the investigation.'"  [Doc. 144 at 17-18 (citation omitted); see also Doc. 235 at 12].  However, "the fact that the traditional methods in use were producing evidence does not alter [the Court's] conclusion."  United

_____

requirement.  See [Ex. A, Lijoi Aff. at 7-8; Ex. B, Lijoi Aff. at 7-8; Ex. C, Lijoi Aff. at 7-8; Ex. D, Lijoi Aff. at 7-8].  Thus, the Court finds this argument to be completely without merit.

[22] Degaule challenges the objectives set forth by Agent Lijoi as an "unobtainable list of lofty goals in order to bypass the necessity requirement of a wiretap by suggesting to this court that such goals could not be met through traditional techniques."  [Doc. 235 at 11-12].  However, it does not appear that the objectives of the investigation here were unreasonable or "unobtainable," and although the government had uncovered a portion of the drug and money laundering conspiracy, that fact did not require the investigation to end before the entire conspiracy and all co-conspirators were discovered.  See Hyde, 574 F.2d at 869.  Indeed, "the necessity requirement is directed to the objective of the investigation as a whole, and not to any particular person," and "[i]f the [g]overnment can demonstrate that ordinary investigative techniques would not disclose information covering the scope of the drug trafficking enterprise under investigation, then it has established necessity for the wiretap."  United States v. Reed, 575 F.3d 900, 911 (9th Cir. 2009) (citation omitted).  Accordingly, the Court rejects Degaule's argument in this regard.  See United States v. Lopez, No. CR 06-00466 DDP, 2008 WL 2156758, at *6 (C.D. Cal. May 19, 2008) (rejecting defendant's argument that objectives in affidavit, which are similar to those present here, were "overbroad, unrealistic, and unattainable").

States v. Allen, 274 Fed. App. 811, 816 (11th Cir. 2008) (per curiam) (unpublished).

"Nothing in the law requires that the traditional methods be entirely useless or that

the district court force the government to redefine its objectives." Id. In fact, "[t]his

circuit has repeatedly held that, where conventional techniques will not show the

entire scope of the conspiracy, a wiretap is permissible, even in those situations

where conventional techniques will allow for the arrest and conviction of some

members." United States v. Kelley, Criminal No. 08-00327-CG, 2009 WL 2589086,

at *2 (S.D. Ala. Aug. 17, 2009) (internal marks and citations omitted).

Here, "[i]n the affidavit[s], the agent repeatedly emphasized that [the]

evidence was . . . unhelpful to the government's goal of revealing the entire

conspiracy." Allen, 248 Fed. App. at 816; see also [Ex. A, Lijoi Aff. at 82-89, 94-96,

100-02, 105; Ex. B, Lijoi Aff. at 54-62, 68-69, 73, 75-76, 79; Ex. C, Lijoi Aff. at 36-45, 47,

56-57, 61, 63, 68-69; Ex. D, Lijoi Aff. at 46-55, 59-60, 68-69, 73-77, 80]. Indeed, "[t]he

evidence reflects that various members of the drug conspiracy facilitated the

criminal enterprise through multiple telephone conversations from several

locations," and "it does not appear that the government could have uncovered the

full scope of the conspiracy, especially not in a relatively safe manner, without the

wiretaps." United States v. Stewart, 306 F.3d 295, 305-06 (6th Cir. 2002).

Accordingly, the Court rejects Degaule's arguments in this regard, and "finds that

the government met the necessity requirements of 18 U.S.C. § 2518 in its

36

application[s] for a wiretap."  Kelley, 2009 WL 2589086, at *3; United States v.

Olmedo, 552 F. Supp. 2d 1347, 1366 (S.D. Fla. 2008), adopted at 1350.[23]

### c.    GPS Information

Degaule moves to suppress any information or data obtained as a result of the

seizure of the geographic location or GPS data of TT1 and TT7, arguing that the

interception of such data is not authorized by Title III and constitutes an illegal

search in violation of his Fourth Amendment right to a reasonable expectation of

privacy.  [Doc. 164 at 3-8].  However, as the government contends, [Doc. 213 at 49-

---

[23] Degaule "requests a Franks hearing to determine the full extent of the information gathered from the cooperating individuals in this case; and the extent and potential value of the information and evidence that could have been realized had the conventional investigation continued." [Doc. 144 at 19].  However, in order to merit such a hearing, Degaule must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit."  Franks, 438 U.S. at 155-56.  See also Wilson, 314 Fed. App. at 243.  "Franks also applies when the 'misinformation' involves omissions from the affidavit made intentionally or with a reckless disregard for the accuracy of the affidavit."  Flores, 2007 WL 2904109, at *31 (internal marks and citations omitted).  Degaule's attack, however, "must be more than conclusory and must be supported by more than a mere desire to cross-examine."  Id. at *32 (quoting Franks, 438 U.S. at 171-72).  "'There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.'"  Id. (quoting Franks, 438 U.S. at 171-72).  In the present case, Degaule makes no such allegation of deliberate falsehood or reckless disregard for the truth, and he has therefore failed to meet the minimum requirements for a Franks hearing.  See Robles, 283 Fed. App. at 735; Kelley, 2009 WL 2589086, at *3; Flores, 2007 WL 2904109, at *32-33; Batiste, 2007 WL 241837, at *20-21; United States v. Angulo-Hurtado, 165 F. Supp. 2d 1363, 1373 (N.D. Ga. 2001).

54], Degaule overlooks the fact that he lacks standing to challenge the seizure of this information because he does not have a privacy or possessory interest in TT1 or TT7.

"The Fourth Amendment protects an individual in those places where he can demonstrate a reasonable expectation of privacy against government intrusion." United States v. Suarez-Blanca, Criminal Indictment No. 1:07-CR-0023-MHS/AJB, 2008 WL 4200156, at *5 (N.D. Ga. Apr. 21, 2008) (citing Katz v. United States, 389 U.S. 347, 353 (1967)). "Fourth Amendment rights, however, are personal, and only individuals who actually enjoy the reasonable expectation of privacy have standing to challenge the validity of a government search." Id. (citations omitted). See also Rakas v. Illinois, 439 U.S. 128, 133-34 (1978). "To have standing to challenge a search, one must manifest a subjective expectation of privacy in the invaded area that society is prepared to recognize as reasonable." Suarez-Blanca, 2008 WL 4200156, at *5 (internal marks and citations omitted). See also California v. Ciraolo, 476 U.S. 207, 211 (1986) (standing to challenge search requires a subjective expectation of privacy that society would recognize as legitimate); United States v. Baron-Mantilla, 743 F.2d 868, 870 (11th Cir. 1984) (per curiam). Additionally, "'[l]egitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" Suarez-Blanca, 2008 WL 4200156, at *5 (quoting Rakas, 439 U.S. at 143 n.12) (alteration in original).

"Thus, an individual asserting Fourth Amendment rights 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable[.]'" Id. at *6 (quoting Minnesota v. Carter, 525 U.S. 83, 88 (1998)) (alteration in original). That is, Degaule "must establish both a subjective and an objective expectation of privacy," and he "bear[s] the burden of showing a legitimate expectation of privacy in the area searched." Id. (citations omitted).

"Courts have determined that an individual does not have a legitimate expectation of privacy in items that are not in the individual's name or when an individual uses an alias or fictitious name and there is no other evidence linking the defendant to the item or property." Id. (footnote and citations omitted). Here, Degaule has failed to show any reasonable expectation of privacy in TT1 and TT7. Indeed, the subscribers of TT1 and TT7 were identified as S. Johnson and Rosse Ram from Rancho Cucamonga, California, respectively, and both phones were described as being utilized by J. Johnson. [Ex. A, Lijoi Aff. at 9, 74; Ex. B, Lijoi Aff. at 9; Ex. C, Lijoi Aff. at 9; Ex. D, Lijoi Aff. at 9, 41]. Degaule has not shown that he had possession, ownership, or control over either TT1 or TT7, and the evidence before the Court is insufficient to establish that he has any reasonable expectation of privacy in these phones. See Suarez-Blanca, 2008 WL 4200156, at *7.[24] Accordingly,

_____

[24] Alternatively, even if Degaule had standing to contest the seizure of GPS information from TT1 and TT7, in its applications for the wiretap orders, the government relied on Federal Rule of Criminal Procedure 41, which provides that

39

Degaule's suppression motion in this regard is due to be denied.  See United States v. Skinner, No. 3:06-CR-100, 2007 WL 1556596, at *15, 17 (E.D. Tenn. May 24, 2007), adopted at *1 (finding defendant lacked standing to assert a Fourth Amendment protected interest in cell phone not subscribed in his name and had no statutory right to privacy in the phone); United States v. Castillo-Martinez, No. 04-CR-6128L, 2007 WL 1026363, at *5 (W.D.N.Y. Apr. 2, 2007), adopted at *2 (finding that defendant did not have a privacy interest in cell phone number that was not registered or used by the defendant).[25]  Thus, for all the foregoing reasons, it is

---

a judge "must issue the warrant if there is probable cause to . . . install and use a tracking device."  Fed. R. Crim. P. 41(d)(1).  In the present case, "for each of the Target Telephones at issue, and in each of the relevant applications, given the volume of evidence presented, this Court cannot conclude that any of the district judges who issued the subject orders abused his . . . discretion in finding probable cause to believe that their authorizing a 'search' by obtaining GPS information would reveal a crime or evidence of a crime," and "there is no requirement . . . that a search warrant for GPS information be independent from a wiretap order, and therefore, its inclusion with the subject wiretap orders does not render either defective."  Ortega-Estrada, 2008 WL 4716949, at *14.

[25] Degaule also contends that the evidence obtained as a result of the wiretaps of TT1 and TT7, should be suppressed because the government failed to comply with the minimization requirements of 18 U.S.C. § 2518(5).  [Doc. 144 at 7-9].  "Title III does not forbid the interception of all innocent conversations, but instead directs the [g]overnment to conduct its wiretaps so as to minimize the interception of such conversations."  Ortega-Estrada, 2008 WL 4716949, at *8.  However, "[s]tanding to challenge improper minimization requires the showing of a direct privacy interest."  Castillo-Martinez, 2007 WL 1026363, at *5 (citations omitted).  Again, "[t]o establish a direct privacy interest, a defendant must demonstrate a possessory or proprietary interest in the home in which the telephone is located or in the telephone itself."  Id. (citations omitted).  Additionally, "even defendants who are named as targets of the investigation may lack standing to challenge law enforcement's minimization

hereby **RECOMMENDED** that Degaule's motion to suppress intercepted

communications, [Doc. 144], be **DENIED**.[26]

_____

techniques if they did not have an expectation of privacy in the residence in which the tapped telephone was located." Id. (citations omitted). See also United States v. Crowley, No. 07-CR-37S, 2008 WL 413302, at *3 (W.D.N.Y. Feb. 13, 2008), adopted at *1. As discussed, Degaule has not shown any direct privacy interest in TT1 or TT7, and therefore "lacks standing to raise the minimization challenge." Crowley, 2008 WL 413302, at *3. Finally, Degaule argues that the wiretap orders are "unparticularized in nature and facially invalid" because they authorized the right to tap not only the target telephones identified by its individual mobile subscriber identity number ("IMSI") and its electronic serial number ("ESN"), but also any other phone number to which that IMSI or ESN is assigned. [Doc. 144 at 19-22]. Courts in this district, however, have rejected this very same argument, finding that where the wiretap orders specify the target telephone by its telephone number, IMSI, and ESN, they "relate to a particular telephone and telephone number, and therefore . . . are not general authorizations to intercept telephone calls on any number of telephones." Ortega-Estrada, 2008 WL 4716949, at *10. Indeed, the wiretap orders here "do not grant the authority to wiretap multiple telephones; they simply recognize that, as a means of thwarting an investigation, a user of a particular cellular telephone may, without great difficulty, obtain a new telephone number for the Target Telephone or have his existing telephone number assigned to a new cell phone with a different ESN." Id. "That the [o]rders covered those possibilities does not turn them into general wiretap authority," id., and the Court therefore rejects Degaule's argument in this regard.

[26] Even if the wiretaps were found to be invalid, suppression of the evidence seized is not warranted because the agents reasonably relied in good faith on the warrants. See United States v. Leon, 468 U.S. 897 (1984)."[T]he purpose of the exclusionary rule is to act as a deterrent to willful conduct that violates individual rights." United States v. Russell, Cr. No. 2:08CR121-WHA, 2008 WL 4649051, at *5 (M.D. Ala. Oct. 20, 2008), adopted at *1 (internal marks and citation omitted). In the present case, "the law enforcement officers did exactly what the law requires," in that applications and affidavits for the wiretaps at issue were submitted to federal district judges, all of whom then made a probable cause determination. Id. Given these circumstances, it was objectively reasonable for the agents to conclude that probable cause for the warrants existed and for them to rely in good faith on the wiretaps as issued by the district judges. See id.; United States v. Glinton, 154 F.3d

**B.**   **Motions to Suppress Evidence and Statements, [Docs. 146 & 206]**

Degaule moves to suppress all evidence and statements arising from his arrest on June 17, 2010, and the subsequent search of his residence and former business. [Docs. 146 & 206].   For the following reasons, it is **RECOMMENDED** that his motions to suppress, [Docs. 146 & 206], be **DENIED**.

**1.**   **Statement of Facts**

On June 17, 2010, at 6:07 a.m., several law enforcement officers arrived at Degaule's residence located at 3220 Lynwood Drive in Atlanta to execute an arrest warrant for Degaule obtained following the return of the superseding indictment in this case. [Doc. 248 at 12-15, 18, 31, 43].[27]   Gwinnett County Police Department

---

1245, 1257 (11th Cir. 1998); Flores, 2007 WL 2904109, at *7; United States v. Leiva-Portillo, No. 1:06-CR-350-WSD, 2007 WL 1706351, at *12 (N.D. Ga. June 12, 2007), adopted at *3.  Degaule contends, without any supporting argument, that the good faith exception is inapplicable because the issuing judges were misled by Agent Lijoi. [Doc. 235 at 13].  However, the Court finds no support for this argument that Agent Lijoi was dishonest or that he attempted to mislead the issuing judges in any way.  See Batiste, 2007 WL 2412837, at *24.  "Nor has [Degaule] provided any evidence that the issuing judge[s] [were] actually misled by the affidavit[s]." United States v. Byrd, No. 2:08-cr-216-MEF, 2009 WL 902539, at *4 (M.D. Ala. Apr. 1, 2009), adopted at *1.  Accordingly, the Court finds Degaule's contention in this regard completely without merit.

[27] Degaule's residence sits back further from the street than the surrounding houses, allowing a clear view from the front door of the house to the front of the street, but only a limited view to the left and right of the residence. [Doc. 248 at 14-17].  Therefore, the agents had unmarked patrol cars parked up the street, out of sight from Degaule's residence, and a marked DeKalb County Police Department patrol car parked directly in front of his home.  [Id. at 14-15, 17, 55].

Officer Dustin Seeton ("Officer Seeton"), who is assigned to the Atlanta High Intensity Drug Trafficking Area ("HIDTA") Task Force, along with DEA Special Agent Rob Norton ("Agent Norton"), Task Force Officer Benjamin Lucas ("Officer Lucas"), wearing their duty belts with holstered guns and bulletproof vests that had "Police" printed on the front and "Federal Agent" printed on the side, approached the front door of Degaule's residence and knocked, and after approximately thirty seconds had passed, Degaule opened the door.[28] [Id. at 15-17, 51]; see also (Degaule Gov. Ex. 36; Degaule Gov. Ex. 37 at 1).  Officer Seeton identified himself, explained that he had a warrant for Degaule's arrest, and was requesting permission to enter the residence so that they could avoid making a scene, when Degaule, who was wearing either running shorts or pants and a t-shirt and standing about three to four feet inside his residence and away from the threshold, interrupted and said, "DEA?" [Doc. 248 at 17-18, 22, 51]; (Degaule Gov. Ex. 37 at 1-2).  The agents confirmed that they were with the DEA, and Degaule replied, "I don't do no drugs," and again interrupted Officer Seeton, who was still trying to request permission to enter the residence, by stating, "I change . . . you can come in . . . I'll change," while simultaneously waiving his arms to motion for the agents to come inside of the

---

[28] After exiting their patrol vehicle and upon approach to the residence, Agent Norton activated a recording device to record the events about to transpire.  [Doc. 248 at 15]; see also (Degaule Gov. Ex. 36).  The recording, which lasts approximately four hours, has been transcribed and admitted as an exhibit, and will be referred to herein as ("Degaule Gov. Ex. 37").

residence.  [Doc. 248 at 22, 45, 48, 51]; (Degaule Gov. Ex. 37 at 2).  Officer Seeton still

requested permission to enter the residence, and Degaule replied, "Yeah, yeah.  Yes,

sir, please come in."  (Degaule Gov. Ex. 37 at 2).

Upon entry, Officer Seeton asked Degaule whether anyone else was present

in the home, and Degaule indicated that he was not sure whether his wife was

exercising downstairs.  [Doc. 248 at 22]; (Degaule Gov. Ex. 37 at 2).[29]  As Officer

Seeton began to request permission to check to see if she was downstairs, Degaule

interrupted and said, "You want to check?" and then proceeded to escort the agents

downstairs.  [Doc. 248 at 22]; (Degaule Gov. Ex. 37 at 2).  Degaule was not placed in

handcuffs or in any way restrained at this time.  [Doc. 248 at 22, 25, 39].[30]  Once they

reached the basement, Degaule confirmed that his wife was not present and

---

[29] The front entrance to Degaule's residence is located at the top of a flight of
stairs so that entry is actually made at the mid-level of the residence with a basement
below and another level above.  [Doc. 248 at 15].  Upon entry into the home, there
is a dining room to the left and a small room to the right that appeared to be used
as an office.  [Id. at 39, 42].  Officer Seeton testified that prior to approaching
Degaule's residence, they knew that the case involved drug trafficking and money
laundering, that some of Degaule's alleged co-conspirators had been present at his
home on prior occasions, and that some of these co-conspirators had carried
firearms with them during different transactions that had occurred over the course
of the investigation.  [Id. at 19-21, 52-53].

[30] In fact, Degaule was not placed in handcuffs until it was time to transport
him to the Sandy Springs Police Department for processing, and the agents kept
their guns holstered at all times.  [Doc. 248 at 30, 39].

explained to the agents that she sometimes exercised at a gym.  [Id. at 22-23];

(Degaule Gov. Ex. 37 at 2-3).

After the agents walked back upstairs, Degaule retrieved a cloth briefcase or

attache case, headed towards the dining room, and advised the agents that "I got

something in there that I got to give you first."  (Degaule Gov. Ex. 37 at 3); [Doc. 248

at 23-24].  Degaule then retrieved several documents from the case and presented

them to the agents, instructing them to review and fill out the forms.[31]  [Doc. 248 at

_____

[31] These documents related to Degaule's assertion of status as a "sovereign
citizen" and included an account for a pre-established bond.  [Doc. 248 at 24];
(Degaule Gov. Ex. 1; Degaule Gov. Ex. 37 at 4-6, 14, 161; Def. Ex. 1 ¶ 5).
Additionally, Degaule requested that the agents fill out one of the documents titled
"Public Servant Questionnaire," advising them that anytime he comes into contact
with law enforcement, they have to fill out this questionnaire.  (Degaule Gov. Ex. 37
at 4-5, 7; Def. Ex. 1 ¶ 6).  Specifically, the questionnaire states, "This questionnaire
must be filled-out by any public servant before he can ask the citizen any question.
Federal law, including the Privacy Act, 5 U.S.C. 552a, 88 Stat. 1896, et seq., 1974,
authorizes this."  [Doc. 273-1 at 2]; (Def. Ex. 1 at 2).  The questionnaire then asks
several questions, including the public servant's full legal name, address,
identification number, and badge number; the name and address of the agency;
whether the public servant will uphold the U.S. Constitution; whether the public
servant will furnish a copy of the law or regulation that authorizes the action being
taken on information being requested; whether the answers are voluntary or
mandatory; whether the questions being asked are based upon a specific law or
regulation or are part of a discovery process; what uses may be made of the
information; what other agencies may have access to the information; what the effect
of choosing not to answer will be; whether the investigation is general or special;
whether the public servant has consulted, questioned, interviewed, or received
information from any third party and the identity of the third parties; whether the
public servant reasonably anticipates either a civil or criminal action being initiated
or pursued based upon any of the information; and whether the public servant will
guarantee that any other department other than the one by which he is employed
will not use the information.  [Doc. 273-1 at 2-4].  The public servant is to then sign

23-24]; (Degaule Gov. Ex. 37 at 3-4; Degaule Gov. Ex. 1).  While the agents were reviewing these documents, DEA Intel Group Supervisor Kelly Robinson ("Sup. Robinson") joined the group in the dining room, and a discussion regarding the documents ensued.  [Doc. 248 at 26]; (Degaule Gov. Ex. 37 at 4-7).  During this time, Officer Seeton asked Degaule whether there were any other persons in the residence and if they could "walk around and just verify there's no one hiding."  [Doc. 248 at 24-25, 52, 67]; (Degaule Gov. Ex. 37 at 9-10).  Degaule replied, "Let's go.  Let's go. Let's go.  Let's go," and "Okay.  Let's do it."  (Degaule Gov. Ex. 37 at 10); [Doc. 248 at 25, 52].  Degaule then proceeded to escort the agents through the house, describing each room, opening secured doors, and confirming that no one else was present in the home.  [Doc. 248 at 25-26, 54, 67]; (Degaule Gov. Ex. 37 at 10-11).[32]

After they concluded the sweep of the residence, Degaule and Officer Seeton returned to the dining room and joined Agent Norton, Officer Lucas, and Sup. Robinson at the table.  [Doc. 248 at 26].  At this time, Officer Seeton showed Degaule the arrest warrant, explained that based on a long-term investigation, he had been indicted with other co-conspirators, some of whom he identified by name, and advised him that the "charges that [he was] looking at are very, very severe,"

_____

the questionnaire under the penalty of perjury.  [Id. at 4].

[32] Officer Seeton testified that during this sweep of the residence, they "were looking for people" and not evidence.  [Doc. 248 at 25, 54].

"obviously carry a long prison sentence," and that he was "definitely . . . going to jail . . . tonight." (Degaule Gov. Ex. 37 at 12-13); [Doc. 248 at 26, 30]. Officer Seeton then asked Degaule whether he understood what was going on and if he wanted to continue talking, and Degaule replied, "Sure." (Degaule Gov. Ex. 37 at 13); [Doc. 248 at 26].

Prior to interviewing him, Officer Seeton began to advise Degaule of his Miranda[33] rights, but Degaule interrupted him and returned to the prior conversation relating to the documents he had provided the agents, stating "You guys . . . are supposed to fill this out before we even start." (Degaule Gov. Ex. 37 at 13). In response, Agent Norton advised Degaule that the documents he presented had no impact on what was happening, that they were going to treat him like any other person in the country legally, that they were legally obligated to read him his rights prior to speaking with him any further, and that they wanted to make sure he understood what was taking place. (Id. at 14-15).[34] Degaule responded, "This document also stated that in order to proceed speaking to you guys I need those

---

[33] Miranda v. Arizona, 384 U.S. 436 (1966).

[34] Agent Norton also advised Degaule that a grand jury indicted him along with his co-conspirators and found that he should be "brought before a judge, arrested, [and] formally charged." (Degaule Gov. Ex. 37 at 14). He further advised Degaule that "the purpose of what we're getting into right now is more to see if you want to . . . start the process of helping yourself out by reducing your exposure, by showing that you're, you know willing to cooperate with the investigation." (Id.); see also [Doc. 248 at 61].

questionnaires to be answered."  (Id. at 15).  Agent Norton again advised Degaule

that Officer Seeton would "look through the questions and see if it affects anything,"

but that they were going to move forward and advise him of his Miranda rights.

(Id.).

Officer Seeton then proceeded to advise Degaule of his rights by reading the

rights in English from a DEA-13 Advice of Rights and Waiver Form.  [Doc. 248 at 27,

65]; (Degaule Gov. Ex. 5; Degaule Gov. Ex. 37 at 15).[35]  Specifically, Officer Seeton

advised Degaule that he had the right to remain silent and that any statements he

made could be used against him in court.  (Degaule Gov. Ex. 5; Degaule Gov. Ex. 37

at 15).  He further advised Degaule that he had the right to speak to an attorney, to

have one present during the questioning, and to have one appointed for him if he

could not afford one.  (Degaule Gov. Ex. 5; Degaule Gov. Ex. 37 at 15).  Officer

Seeton confirmed that Degaule understood what he had just read to him, and in

response to Officer Seeton's question of whether he was still willing to answer

questions, Degaule responded, "Yes, I'm ready to answer some questions."

(Degaule Gov. Ex. 37 at 16); [Doc. 248 at 66].

---

[35] Prior to reading Degaule his rights, Officer Seeton ascertained that Degaule, who is a native of Haiti but had recently become a naturalized United States citizen, had no problem reading and writing in the English language.  (Degaule Gov. Ex. 37 at 6-7, 14-15, 167).

However, as Officer Seeton began the interview, Degaule again asked whether the agents were "going to acknowledge [his] documents here to be filled out by all the agents."  (Degaule Gov. Ex. 37 at 16).  After a short discussion regarding Degaule's questionnaire, Agent Norton advised Degaule that he would fill it out as they were "going through this process."  (Id. at 17).[36]  In addition, Officer Seeton advised Degaule that if he wanted to ask him any of the questions, he had "no problem answering for [him]," and Degaule responded, "Okay."  (Id. at 16-17).  Based on this discussion and because he wanted to be "crystal clear" that Degaule understood his Miranda rights, Officer Seeton asked Degaule to again read each of his rights and to initial beside each one, acknowledging that he understood them.  [Doc. 248 at 27-28, 65]; (Degaule Gov. Ex. 37 at 17-18; Degaule Gov. Ex. 5).  He also asked Degaule to sign the waiver of rights portion of the form.  (Degaule Gov. Ex. 37 at 18; Degaule Gov. Ex. 5).  In response, Degaule initialed beside each right and then checked the box, indicating that he had read his rights, understood what they were, and that he was "willing to freely and voluntarily answer questions without a lawyer present."  [Doc. 248 at 27-28, 66]; (Degaule Gov. Ex. 37 at 17-18; Degaule Gov. Ex. 5).  Degaule also affixed postage stamps in the areas on the form he was

---

[36] At the hearing on April 21, 2011, [Doc. 291], the government proffered, without objection, that Agent Norton began to fill out the questionnaire Degaule gave him, but he did not complete the entire form because it included questions calling for personal information such as his residence address.  Agent Norton left the partially completed questionnaire at Degaule's residence.

going to initial and sign and then either initialed or signed over the stamps.[37]  [Doc.

248 at 27-28]; (Degaule Gov. Ex. 37 at 18; Degaule Gov. Ex. 5).  After Degaule signed

the waiver portion of the form, Officer Seeton, along with Officer Lucas, Agent

Norton, and Sup. Robinson, proceeded to interview him.[38]

At the onset of the interview, Officer Seeton explained to Degaule that one of

their main concerns was whether there were any narcotics stashed in the house to

which Degaule responded, "I do not do drugs," "I don't touch drugs at all," and "I

don't deal with drugs; I don't do nothing with drugs," and he then offered to take

---

[37] Degaule stated that he could not initial or sign any documents unless he first placed a stamp on them.  (Degaule Gov. Ex. 37 at 18).

[38] Degaule appeared to understand the questions being asked of him and did not appear to be under the influence of any drugs or alcohol or appear to be confused or disoriented.  [Doc. 248 at 28-29, 46].  Although Degaule admitted that he took pain killers on a regular basis, he advised the agents that he had not taken any that morning.  [Id. at 28]; see also (Degaule Gov. Ex. 37 at 87-88).  Degaule's demeanor was calm and he was very accommodating.  [Doc. 248 at 29, 53-54].  The agents did not display any force or restrain Degaule in any way.  [Id. at 30].  Degaule understood that he was under arrest, that he was going to jail that night, and the potential consequences to him and his family.  [Id. at 29-30, 46].  Specifically, Officer Seeton advised Degaule that since his wife was a doctor with a DEA license to prescribe narcotics, that the charges against Degaule could impact his wife's practice of medicine.  [Id. at 30]; (Degaule Gov. Ex. 37 at 141-42).  Degaule, however, responded that his wife had nothing to do with what he did, that they had separate accounts, filed separate tax returns, and that they operated separately.  (Degaule Gov. Ex. 37 at 25, 142, 147-48).  Later during the interview, Degaule's wife came home and she reiterated to Officer Seeton that she "really didn't know a whole lot about her husband and that they live a very separate life from each other."  [Doc. 248 at 44].

Officer Seeton to "every closet."  (Degaule Gov. Ex. 37 at 19).  Officer Seeton asked Degaule for permission to have a "drug sniffing canine" walk through the house "real quick just to make sure," and Degaule responded, "I don't mind, come on in." (Id.); see also [Doc. 248 at 52].  At this point, Officer Seeton asked Agent Norton to secure a canine in order to conduct a canine sniff of the residence, and Degaule stated, "You . . . You guys know the house now?"  (Degaule Gov. Ex. 37 at 19).

While Agent Norton worked on securing a canine, Officer Seeton continued his interview of Degaule.  Specifically, Officer Seeton asked Degaule whether he presently had anything in the house belonging to J. Johnson and whether he had any cash in the house.  (Id.).  Degaule replied that he had J. Johnson's birth certificate and some paperwork of his, but no large amounts of cash.  (Id. at 20-22).  Degaule also explained that he maintained a small document safe in the home.  (Id. at 21). During this discussion in the dining room, Officer Seeton requested consent to search the residence from Degaule, stating "I'm asking for permission basically just to search the house.  I want to make sure there's no drugs here, I want to make sure that . . . my biggest concern is there's no drugs in this house," and Degaule responded, "No problem."  (Id.); see also [Doc. 248 at 31-32, 55].  Officer Seeton advised Degaule that he did not have to consent to the search, presented him with a consent to search form for his residence, and asked that he read the form and sign

it.  (Degaule Gov. Ex. 37 at 21); [Doc. 248 at 31, 56].  After reading the form, Degaule

affixed his postage stamp on the signature line and then signed over the stamp,

acknowledging that he freely consented to the search of his residence.  [Doc. 248 at

56]; (Degaule Gov. Ex. 4).[39]

At this point, Officers Seeton and Lucas continued interviewing Degaule and

asked about his relationship with J. Johnson.  (Degaule Gov. Ex. 37 at 26-36, 39, 43-

60, 63-67, 74-78, 88-123, 127-29, 131-32, 134-40, 143, 145-47, 174-75, 181-85).

Specifically, Officer Seeton advised Degaule that the main part of the investigation

revolved around his "movement of all the money that [he had] been moving in bank

accounts in reference to [J. Johnson]," and that it was "very clear" what he had been

doing with this money, which was the reason he was being charged with laundering

money for a drug trafficking organization.  (Id. at 26-27); see also [Doc. 248 at 68-69].

Degaule explained that beginning in 2008, he provided consulting financial services

for J. Johnson and S. Johnson and their businesses, which required him to, among

other things, travel to Philadelphia, New York, and Kansas City in order to pick up

---

[39] After a short discussion about Degaule's occupation as a "financial
consultant" and a previous computer and vacuum business he owned located off of
Goldsmith Road, Agent Norton returned with a canine officer and drug detection
canine, and asked Degaule if he would mind if Agent Norton walked through the
house with the canine officer since he is already familiar with the layout, and
Degaule, who had first asked if they wanted the garage door open, said, "Go, go."
(Degaule Gov. Ex. 37 at 22-24).

and deposit large sums of money, and to write checks, make payments, and oversee

the expansion of a restaurant and the development of a racetrack.  (Degaule Gov. Ex.

37 at 27-33, 38-39, 43-55, 59-60, 65-68, 74, 77-78, 88-121, 131-40, 145-48).

When asked where he kept his business records, Degaule explained that he

kept them at his previously owned vacuum business on Goldsmith Road as well as

in his house.  (Id. at 41-42, 61-62).[40]  At this point, Agent Norton returned and

advised Degaule that the investigation was very document intensive and that they

wanted to narrow the scope of their search to only those documents that were

relevant to the investigation.  [Doc. 248 at 68-69]; (Degaule Gov. Ex. 37 at 62-63).  In

this regard, Agent Norton again reiterated that they were at Degaule's house that

day "because of what [he was] doing with Mr. Johnson," and asked if Degaule was

"clear on that."  (Degaule Gov. Ex. 37 at 63).  Degaule acknowledged that he

---

[40] In particular, Degaule explained that he kept business records in the
basement of his home as well as at the Goldsmith Road location.  (Degaule Gov. Ex.
37 at 41, 61-62, 86).  With regard to whether he kept records regarding the large
deposits of cash he had made, Degaule responded that he kept records for all of the
business he conducts.  (Id. at 47).  As for records regarding a loan he had attempted
to obtain on behalf of J. Johnson, Degaule explained that these were possibly in the
basement.  (Id. at 48).  When questioned about business records concerning various
financial services he provided and his buying and selling of houses, Degaule
responded that he had several boxes in the garage downstairs as well as at the
Goldsmith Road location.  (Id. at 61-62).  Additionally, Degaule stated, "We have
records" in response to a question regarding whether he had records related to the
payments he said he made to business vendors on behalf of J. Johnson.  (Id. at 101).
Finally, Degaule advised the agents that everything he did was reported to the
Internal Revenue Service.  (Id. at 56-58).

understood and offered to assist the agents in reviewing the documents and narrowing the scope of the search in order locate only those documents related to his dealings with J. Johnson.  (<u>Id.</u> at 63).[41]

During the search, Agent Norton advised Degaule that they had located documents that they "need to look at a little further," and that they were going to take those back to their office.  (<u>Id.</u> at 72).  Degaule asked if he could see the documents they were going to take with them, and Agent Norton confirmed that he would be able to "see everything . . . that we're taking."  (<u>Id.</u>).  Agent Norton also asked Degaule for the combination to his safe, and Degaule offered to open it for him.  (<u>Id.</u> at 72-73); [Doc. 248 at 32].[42]  As the agents continued their search of the residence, they located another safe in a closet in the basement and asked Degaule if he had the combination for it.  (Degaule Gov. Ex. 37 at 79-80); [Doc. 248 at 32].

---

[41] Specifically, Degaule stated, "Well, we, could go through the documents . . . to see what's in it . . . and if it is related. We got [sic] to give it to you." (Degaule Gov. Ex. 37 at 63).  They then decided that the agents would go downstairs to retrieve the documents and bring them upstairs for Degaule's review.  (<u>Id.</u>).  The agents also asked Degaule to retrieve his two cell phones and their chargers, and he complied.  (<u>Id.</u> at 45-46, 64); [Doc. 248 at 62-63].

[42] During the discussion about opening the safe, Officer Seeton told Degaule that he was skeptical about most of Degaule's responses, that their investigation involved the use of wiretaps, and that they had therefore overheard conversations between he and J. Johnson.  (Degaule Gov. Ex. 37 at 73).  Officer Seeton then reiterated that this was the time to cooperate and be truthful, and that Degaule's cooperation could lead to a lesser sentence.  (<u>Id.</u> at 73-74, 77).

Degaule responded that he would have to look for it as he had written it down somewhere, but that the safe was empty. (Degaule Gov. Ex. 37 at 79-80, 83). Upon recovering the combination, Degaule gave it to the agents and said, "You guys have to be satisfied, right? Okay, then, just put this back, no problem. As long as you guys satisfied I'm satisfied." (Id. at 83); see also [Doc. 248 at 61]. Agent Norton then advised Degaule that in cases like his, they often take the computers out of the house to search, but that in this instance, they would rather, with his permission, make a copy of the hard drive. (Degaule Gov. Ex. 37 at 83); [Doc. 248 at 60]. Degaule responded by twice saying, "No problem." (Degaule Gov. Ex. 37 at 83); [Doc. 248 at 60].[43]

In addition to obtaining Degaule's consent to search the residence, Officer Seeton also asked Degaule for consent to search the Goldsmith Road location and a safe deposit box located at Wachovia Bank, which he granted. (Degaule Gov. Ex. 37 at 86, 142-44, 152-54); [Doc. 248 at 33, 57-58]. Specifically, the agents presented Degaule with a consent to search form for 1109 Goldsmith Road, Suite A, located in Stone Mountain, Georgia, and he then affixed a postage stamp on the signature line and signed over the stamp, acknowledging that he freely consented to the search.

---

[43] At this point, Degaule was allowed to change clothes. [Doc. 248 at 45]; (Degaule Gov. Ex. 37 at 84, 86).

[Doc. 248 at 33-35]; (Degaule Gov. Ex. 6).[44]  Likewise, the agents presented Degaule

with a consent to search form for a Wachovia Bank safe deposit box, and he again

affixed a postage stamp on the signature line and then signed over the stamp,

acknowledging that he freely consented to the search.  [Doc. 248 at 33-35]; (Degaule

Gov. Ex. 3).[45]

After the search of the residence, the Goldsmith Road location, and the

Wachovia safe deposit box were completed, the agents presented Degaule with an

_____

[44] Degaule also offered to call the Goldsmith location to let them know that the agents were on their way, but the agents advised him that they would rather just go there and talk to whoever is present.  (Degaule Gov. Ex. 37 at 154); see also [Doc. 248 at 38-39].  Although the agents recovered ten boxes during their search of the Goldsmith location, they only seized one box of documents.  [Doc. 248 at 38, 58-59]; (Gov. Ex. 8).

[45] Prior to leaving to search the safe deposit box at Wachovia Bank, Agent Norton instructed Degaule to let them know if he changed his mind and wanted to withdraw his consent.  (Degaule Gov. Ex. 37 at 166).  Degaule responded, "Go, go, go . . . if they need me when you get there they can call me and talk to me."  (Id.). In fact, at no time during the questioning did Degaule express a desire to end the interview or for the agents to stop searching his residence, the Goldsmith location, or the Wachovia safe deposit box.  [Doc. 248 at 31, 38, 43]. During the interview, Degaule was allowed to get water from the kitchen, make coffee, get food, and use the bathroom on multiple occasions.  [Id. at 30-31, 39-41]; (Degaule Gov. Ex. 37 at 87, 166, 175).  He was also allowed to answer his phone to speak to his wife, and he elected not to answer a neighbor's telephone call.  [Doc. 248 at 44-45, 63-64]; (Degaule Gov. Ex. 37 at 115).  Near the conclusion of the interview, Degaule stated, "Do I call my attorney now?," and the agents explained that he would have an opportunity to do so once the U.S. Marshals processed him at intake.  [Doc. 248 at 47]; (Degaule Gov. Ex. 37 at 159).  Degaule was allowed to access one of his cell phones to retrieve his attorney's phone number and he then instructed his wife to call his attorney.  [Doc. 248 at 45]; (Degaule Gov. Ex. 37 at 170-71).

inventory of all of the items they had seized from the locations. [Doc. 248 at 35-37, 59-61]; (Degaule Gov. Ex. 37 at 185; Gov. Exs. 8, 9, & 10).[46] Degaule acknowledged the inventory by affixing a postage stamp to the inventory forms and signing over the stamp. [Doc. 248 at 35-37, 61]; (Gov. Exs. 8, 9, & 10). Additionally, Degaule used a rubber stamp on the forms that imprinted the phrase "Accepted for Value and Returned for Value for Settlement and Closure," and had lines for him to fill in his social security number, a routing number, an account number, his name, and date, which he did. [Doc. 248 at 35-37]; (Gov. Exs. 8, 9, & 10). Degaule was then handcuffed and at 12:54 p.m., he was transported to the Sandy Springs Police Department. [Doc. 248 at 42-43]; (Degaule Gov. Ex. 37 at 180-81).

## 2.    Discussion

Degaule contends that all the evidence seized and statements he made on June 17, 2010, should be suppressed because the initial entry into his residence and subsequent search and seizure were illegal, and the waiver of his <u>Miranda</u> rights was involuntary. [Docs. 146 & 206; <u>see also</u> Doc. 273 at 8]. Degaule advances several arguments regarding the entry, warrantless search of his residence,

---

[46] Officer Seeton testified that in cases such as the present one that involve the use of electronic surveillance, and charges of money laundering and drug trafficking, items, such as documents and cell phones, are considered to be of evidentiary value and would not have been left behind during a consent search situation. [Doc. 248 at 70-73].

subsequent seizure of evidence, and the statements he gave at that time, which the Court will now address.

### a.   *Initial Entry and Protective Sweep of the Residence*

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.   The principal intrusion against which the Fourth Amendment is aimed is physical entry into one's home.   Payton v. New York, 445 U.S. 573, 585 (1980) (citation and quotations omitted).   However, "when law enforcement agents are armed with a valid arrest warrant, i.e., an arrest warrant founded upon probable cause, they possess the 'limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.'" United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1344 (N.D. Ga. 2009), adopted at 1325 (quoting Payton, 445 U.S. at 603).   See also United States v. Bennett, 555 F.3d 962, 964-65 (11th Cir. 2009) (per curiam).   That is, "[a]bsent a search warrant, exigent circumstances or consent, officers typically may enter a dwelling when executing an arrest warrant only to the extent necessary to effectuate the arrest." United States v. Fisher, 150 Fed. App. 674, 676 (9th Cir. 2005) (unpublished) (citation omitted).

58

Additionally, a warrantless "protective sweep" of a residence upon entering to execute an arrest warrant is allowed in certain circumstances.  See Maryland v. Buie, 494 U.S. 325, 334 (1990); United States v. Delgado, 903 F.2d 1495, 1502 (11th Cir. 1990) (citing Buie, 494 U.S. at 334); United States v. Magluta, 44 F.3d 1530, 1538 (11th Cir. 1995) (same).  Indeed, "as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched."  Buie, 494 U.S. at 334.  "'A protective sweep is a quick and limited search of a premise, incident to an arrest and conducted to protect the safety of police officers and others.  It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding.'"  United States v. Rigsby, 943 F.2d 631, 637 (6th Cir. 1991) (quoting Buie, 494 U.S. at 327).

Officers Seeton and Lucas and Agent Norton, who were wearing protective vests with "Police" printed on the front and "Federal Agent" printed on the side and had their guns holstered, approached the front door of Degaule's residence, knocked, and after about thirty seconds, Degaule answered the door, standing approximately three to four feet inside his residence, away from the threshold. [Doc. 248 at 12-18, 22, 31, 43, 51]; (Degaule Gov. Ex. 37 at 1-2).  Officer Seeton identified himself and explained that he had a warrant for Degaule's arrest. [Doc. 248 at 17-18,

22, 51]; (Degaule Gov. Ex. 37 at 1-2).[47]   Instead of immediately entering the residence to arrest Degaule, the agents attempted to request permission to enter, but they were interrupted by Degaule who told the agents that they could come in while motioning with his arms for them to enter the residence.  [Doc. 248 at 17-18, 22, 45, 48, 51]; (Degaule Gov. Ex. 37 at 2).   Nevertheless, Officer Seeton still requested permission to enter the residence, and Degaule gave an affirmative response. (Degaule Gov. Ex. 37 at 2).

Once inside the doorway, Officer Seeton asked if anyone else was in the home, and Degaule said that he was not sure if his wife was exercising downstairs, and he offered to lead the agents downstairs to check.  (Id.); [Doc. 248 at 22].  After the agents confirmed that there was no one present in the basement, Degaule lead them back upstairs to the dining room.  [Doc. 248 at 22-24]; (Degaule Gov. Ex. 37 at 2-4). Shortly thereafter, Officer Seeton asked Degaule whether there were any other persons in the residence and if they could "walk around and just verify there's no one hiding," to which Degaule replied, "Let's go.  Let's go.  Let's go," and "Okay. Let's do it."  [Doc. 248 at 24-25, 52, 67]; (Degaule Gov. Ex. 37 at 9-10).  Degaule then

---

[47] Degaule does not contend that the arrest warrant was invalid, or that the agents lacked reasonable belief that he was inside his residence, and "[e]ven in the absence of any type of warrant, agents may approach a residence and knock on the door for legitimate police purposes unconnected with a search of the premises." United States v. Bergin, 732 F. Supp. 2d 1235, 1244 (M.D. Fla. 2010) (citations omitted).  See also United States v. Taylor, 458 F.3d 1201, 1204 (11th Cir. 2006).

escorted the agents through the house, describing each room, opening secured doors, and confirming that no one else was present in the home.  [Doc. 248 at 25-26, 54, 67]; (Degaule Gov. Ex. 37 at 10-11).  During this sweep, the agents "were looking for people," not evidence.  [Doc. 248 at 25, 54].

While the agents had a valid arrest warrant and were, therefore, authorized to enter the residence to arrest Degaule when he answered the door, see Rodriguez-Alejandro, 664 F. Supp. 2d at 1344, and to conduct a "limited protective sweep in conjunction with [the] in-home arrest," United States v. Correa, No. 1:07-cr-00011-MP-AK, 2008 WL 1804309, at *6 (N.D. Fla. Apr. 18, 2008),[48] the evidence shows that Degaule voluntarily consented to the agents entering his residence and conducting a protective sweep of the entire residence.  "One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent."  United States v. Garcia,

_____

[48] Indeed, "[a] protective sweep of a suspect's house may be made even if the arrest is made near the door but outside the lodging if the arresting officers have reasonable grounds to believe that there are other persons present inside who might present a security risk."  United States v. Watson, 273 F.3d 599, 603 (5th Cir. 2001) (internal marks and citations omitted).  See also Bennett, 555 F.3d at 966.  Here, prior to executing the arrest warrant, the agents had knowledge that the case involved drug trafficking and money laundering, that some of Degaule's co-conspirators had been present at his home on previous occasions, and that some of these co-conspirators had carried firearms with them during various transactions.  [Doc. 248 at 19-21, 52-53].  Thus, Degaule's argument that the layout of his residence made the search incident to a lawful arrest exception inapplicable, [Doc. 273 at 10-11], is without merit.

890 F.2d 355, 360 (11th Cir. 1989) (citation omitted).  Indeed, the Fourth Amendment does not bar police officers from entering a person's home with his consent, so long as the officer's entry into the residence is not prompted by a show of official authority that overcomes the owner's consent. See United States v. Legette, 260 Fed. App. 247, 249 (11th Cir. 2008) (per curiam) (unpublished); United States v. Stiner, 551 F. Supp. 2d 1350, 1356 (M.D. Fla. 2008), adopted at 1352.

"In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice."  Garcia, 890 F.2d at 360. Voluntariness of consent is judged in light of the totality of the circumstances. United States v. Tovar-Rico, 61 F.3d 1529, 1535 (11th Cir. 1995).  Relevant factors include the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found.  United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001).  Ultimately, the burden is on the government to prove that the consent given was voluntary.  United States v. Bentley, 151 Fed. App. 824, 827 (11th Cir. 2005) (per curiam) (unpublished) (citing United States v. Chemaly, 741 F.2d 1346, 1352 (11th Cir. 1984)); Tovar-Rico, 61 F.3d at 1536 (citing Florida v. Royer, 460 U.S. 491, 497 (1983)); United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989).

Degaule contends that the agents "obtained [his] consent to enter and subsequently search his home by deception, through subterfuge and upon the creation of a false exigency." [Doc. 273 at 9]. That is, Degaule argues that "once [he] was under arrest at the front door, he should have been taken to jail and the front door closed and locked," and that he "should never have been directed back into the home by the officers under the guise of avoiding embarrassment, a perceived benefit to [him], just to create the need to do a protective search 'for officer safety.'" [Id.]. The Court finds this argument unpersuasive.

Degaule's contention that the agents misled him "into believing there was a privacy benefit to him which would avoid the embarrassment of his arrest were he to allow the officers to enter his home," [id. at 13],[49] overlooks the fact that as the agents were asking for permission to enter the home, Degaule interrupted them

---

[49] While Degaule contends that he "should never have been directed back into the home by the officers under the guise of avoiding embarrassment," [Doc. 273 at 9], Degaule never actually exited the residence, but was standing three to four feet away from the threshold inside of the residence. [Doc. 248 at 22]. Furthermore, even if the arresting agents had physically restrained Degaule at the front door, they would have still been entitled to sweep the areas adjoining the area of arrest. See United States v. Moore, No. 1:09-CR-15, 2009 WL 2413787, at *4 (N.D. Ind. Aug. 4, 2009). Indeed, "[a]n unknown assailant who attacks officers departing from an arrestee's home poses an equivalent, if not greater, risk to the safety of the officers and others as does the assailant who attacks the officers upon entry." United States v. Burrows, 48 F.3d 1011, 1017 n.9 (7th Cir. 1995). "Thus, the particular facts associated with an arrest may necessitate that officers conduct a protective sweep before they can safely depart the premises." Id.

twice, motioning for them to enter the residence.  [Doc. 248 at 17-18, 22, 45, 48, 51]; (Degaule Gov. Ex. 37 at 2).  Thus, it can hardly be said that the officers misled Degaule into consenting to their entry of the residence since he interrupted their request for permission to enter and invited them inside.  Indeed, since the officers were lawfully authorized to enter the residence to effectuate the arrest without asking for Degaule's consent, "the officers' tactics showed restraint and discipline, respecting the sanctity of the home." United States v. Trejo, 378 Fed. App. 441, 445, 447 (5th Cir. 2010) (per curiam) (unpublished) (finding defendant voluntarily consented to entry into the home and the protective sweep where officer asked defendant, who was standing outside the front door, "if they could discuss matters inside the house, as the neighbors were watching.").

Degaule also argues that the agents should not have "solicited consent to enter the home post arrest, particularly prior to [him] being advised of his 5th Amendment right to remain silent and his right to counsel before making decisions as to matters which could be used against him later in court."  [Doc. 273 at 9].  However, "a request for consent to search does not elicit any incriminating information toward which the Fifth Amendment is direct[ed]," but rather, "a request for consent merely relates to the preliminary question of the lawfulness of the search." United States v. Rodriguez-Cabrera, 35 F. Supp. 2d 181, 187-88 (D.P.R. 1999) (citation omitted).

That is, "[a] suspect's consent, in and of itself, is not evidence which tends to incriminate him." Id. at 188. See also Tukes v. Dugger, 911 F.2d 508, 513 (11th Cir. 1990) (citations omitted). Thus, Officer Seeton's request for consent to enter the residence is not an interrogation whose purpose was to elicit an incriminating response, triggering the Miranda protections, and the Court rejects Degaule's argument in this regard. See United States v. Smith, 3 F.3d 1088, 1098 (7th Cir. 1993).

Despite Degaule's arguments to the contrary, [Doc. 273 at 12], the evidence shows that he voluntarily consented to the agents entering his residence. Consent to enter was requested in the direct presence of only three agents, none of whom had their weapons drawn, threatened or restrained him in any way, or made any show of force. [Doc. 248 at 22, 25, 39, 52]. Likewise, consent to conduct a protective sweep of the residence was requested in the presence of the same agents, none of whom had drawn their weapons, threatened or restrained Degaule in any way, or made any show of force. [Id. at 22-26, 39, 52, 54, 67]; (Degaule Gov. Ex. 37 at 2, 9-10). Given the totality of the circumstances present here, the evidence establishes that Degaule voluntarily consented to the entry and subsequent sweep of his residence.

> **b.**   *Subsequent Search of Degaule's Residence and the Goldsmith Road Location and Seizure of Evidence*

Degaule challenges the warrantless search of his residence and the Goldsmith Road location and subsequent seizure of evidence on several grounds. First, he

contends that he only consented to a search for narcotics and that the agents therefore exceeded the scope of his consent by searching for documents related to J. Johnson.  [Doc. 273 at 14].  Next, Degaule argues that the agents exceeded the scope of his consent to search when they actually seized documents from his home and the Goldsmith Road location.  [Id. at 17-21].  Finally, Degaule argues that the agents unlawfully seized documents from his home and the Goldsmith Road location without probable cause to believe that the items being seized were contraband or otherwise evidence of a crime.  [Id. at 21-25].

Degaule argues that the search went beyond the scope of his consent, and therefore, any evidence found or taken outside of the scope of his consent must be suppressed.  [Id. at 14-17].  "Consensual searches have consistently been held to be reasonable."  United States v. Susini, 261 Fed. App. 270, 273 (11th Cir. 2008) (per curiam) (unpublished) (emphasis and citation omitted).  "The only restraint on a validly authorized search conducted pursuant to consent is that the scope of the search be limited to the terms of its authorization."  Id. (internal marks and citation omitted).

"When an individual gives a general statement of consent without express limitations, the scope of a permissible search is not limitless."  United States v. Martinez, 949 F.2d 1117, 1119 (11th Cir. 1992) (quoting United States v. Harris, 928

F.2d 1113, 1117 (11th Cir. 1991)) (internal marks omitted). "Rather, it is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass." Id. (quoting Harris, 928 F.2d at 1117) (internal marks omitted). See also United States v. Whaley, No. 10-12255, 2011 WL 521174, at *3 (11th Cir. Feb. 16, 2011) (per curiam) (unpublished). "A general consent to search for specific items is reasonable if it is limited to any compartment or container that might reasonably contain those items." United States v. Woods, 445 F. Supp. 2d 1328, 1332 (M.D. Ala. 2006) (citing United States v. Zapata, 180 F.3d 1237, 1243 (11th Cir. 1999)). In this case, Degaule gave a generalized consent to search his residence, and though Degaule argues that he understood that the purpose of the search was to locate any narcotics, [Doc. 273 at 14], the evidence shows that the searching agents did not exceed the scope of the consent Degaule gave.

While Officer Seeton initially explained to Degaule that one of their main concerns was whether there were any narcotics stashed in the house, and he asked Degaule for consent to have a "drug sniffing canine" walk through the house, (Degaule Gov. Ex. 37 at 18-19); [Doc. 248 at 52], Officer Seeton's subsequent request for consent to search the residence came after he had discussed with Degaule whether he kept any cash, jewelry, or other property related to J. Johnson in his home. (Degaule Gov. Ex. 37 at 19-22). Degaule then signed the consent to search

form, acknowledging that he had been asked to permit the DEA agents to search his residence, that he had not been threatened or forced in any way, and that he freely consented to the search. (Gov. Ex. 4). Officer Seeton even advised Degaule that he did not have to consent to the search. (Degaule Gov. Ex. 37 at 21); [Doc. 248 at 31, 56]. In context, Officer Seeton's request for general permission to search Degaule's residence was understandable as a request to search for anything related to the investigation involving him, any of his co-conspirators, including J. Johnson, and was not limited to a search only for narcotics.

Additionally, even if Degaule did not initially understand that the search of his residence would include a search for documents, he was present during the entire search, and was allowed to move about his residence and observe as agents searched. As the interview progressed, it was made abundantly clear that the investigation centered around his alleged money laundering activities for a drug trafficking organization. (Degaule Gov. Ex. 37 at 26-36, 39, 43-60, 63-67, 74-78, 88-123, 127-29, 131-32, 134-40, 143, 145-47, 174-75, 181-85); [Doc. 248 at 68-69]. In fact, Degaule described where he kept his business records, and upon Agent Norton advising him that the investigation was very document intensive, he even offered to assist the agents in reviewing the documents in order to help narrow the scope

68

of the search to only those documents related to his dealings with J. Johnson. (Degaule Gov. Ex. 37 at 41-42, 44, 48, 58, 61-64, 67-68, 101).

Moreover, Degaule consented to the search of a Wachovia safe deposit box, boxes located at the Goldsmith Road location, to the agents making a copy of his computer's hard drive, and he even provided the agents with combinations to two safes located in the home, and turned over his two cell phones and their chargers. (Id. at 45-46, 64, 72-73, 79-80, 83, 86, 142-44, 152-54; Gov. Exs. 3 & 6); [Doc. 248 at 32-35, 57-58, 60-63].  If Degaule intended the scope of his consent to be limited, he had ample opportunity to object or clarify, especially in light of the cordial, even friendly, tone of communications he had with the agents before and during the search. See United States v. Telcy, 362 Fed. App. 83, 87 (11th Cir. 2010) (per curiam) (unpublished); United States v. Street, 472 F.3d 1298, 1308-09 (11th Cir. 2006); Woods, 445 F. Supp. 2d at 1332-33; United States v. Lima-Suarez, No. 1:05CR40-SPM, 2006 WL 763426, at *5 (N.D. Fla. Mar. 23, 2006).  In fact, at one point during the search, Agent Norton even advised Degaule that if he changed his mind and wanted to withdraw his consent, to just let them know, but Degaule never expressed a desire for the agents to stop the search.  (Degaule Gov. Ex. 37 at 166).  Consequently, given the totality of the circumstances, the agents reasonably concluded that Degaule's consent included consent to search for documents, and therefore, there was no

69

Fourth Amendment violation.  See Street, 472 F.3d at 1308-09 (where defendant signed a consent to search form, was "free to move about [his house]" during the search, and where "[n]owhere in or on the form he signed did [defendant] indicate a desire to restrict the search . . . [n]or did he otherwise indicate to the agents that he wanted to exclude any property from the scope of the search[,] . . . [t]he agents' belief that the police radio, in plain view on the bedroom floor, was within the scope of the consent was reasonable.") (citation omitted); United States v. Ramirez-Chilel, 289 F.3d 744, 752-53 (11th Cir. 2002).

Degaule also argues that he "never consented to the seizure of any items from his home or his prior business location," and therefore the seizure of evidence exceeded the scope of his consent.  [Doc. 273 at 17-21].  Degaule further contends that because he did not consent to the seizure of any evidence, suppression is warranted because the agents also lacked probable cause for the seizure.  [Id. at 21-25].  Degaule's arguments in this regard, however, are without merit.

In support of his argument that he never consented to the seizure of any items, Degaule relies on his statements to the agents at the scene requesting to see the documents that the agents intended to take with them.  [Doc. 273 at 19].  However, prior to requesting to see the documents the agents were taking, Degaule clearly acknowledged that he would be "glad to turn . . . over" any documents

pertaining to the case.  (Degaule Gov. Ex. 37 at 63-64).  Despite Degaule's attempt to equate his request to see the documents prior to the agents taking them to "limitations with regard to the scope of his consent," [Doc. 273 at 20], the record shows that Degaule agreed to turn over any documents that were related to the investigation and even acknowledged the specific items that were taken, (Degaule Gov. Ex. 37 at 63-64; Gov. Exs. 8, 9, & 10).   Accordingly, it is hereby **RECOMMENDED** that Degaule's motion to suppress evidence, [Doc. 146], be **DENIED**.

> **c.**   *Degaule's Statements*

Degaule made statements to the agents on the date of his arrest that he now seeks to suppress, arguing that he did not voluntarily waive his <u>Miranda</u> rights. [Doc. 206; Doc. 273 at 25-30].  It is undisputed that Degaule was in custody at the time he made these statements, and that he was subjected to an "interrogation" by the agents after having been advised of his <u>Miranda</u> rights.  The issue presented is whether Degaule knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights.

The government bears the burden of proving by a preponderance of evidence that Degaule validly waived his <u>Miranda</u> rights.  <u>United States v. Chirinos</u>, 112 F.3d 1089, 1102 (11th Cir. 1997).  <u>See also</u> <u>Colorado v. Connelly</u>, 479 U.S. 157, 168-69

(1986).  In Miranda, the Supreme Court acknowledged that custodial interrogations, by their very nature, create "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."  384 U.S. at 467.  Therefore, to address this inherent compulsion and protect a suspect's Fifth Amendment privilege against self-incrimination, Miranda established certain procedures officers must follow.  Specifically, prior to the initiation of questioning, officers must fully advise the suspect of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires."  Id. at 468-70.  Miranda further requires that law enforcement respect the suspect's decision to exercise his rights as outlined in the warnings.  "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."  Id. at 473-74.  "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."  Id. at 474.

A defendant may waive his rights if the waiver is made knowingly, intelligently, and voluntarily.  Id. at 444.  This inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the 'totality of the circumstances surrounding the interrogation'

> reveal both an uncoerced choice and the requisite level of
> comprehension may a court properly conclude that the *Miranda* rights
> have been waived.

United States v. Patterson, No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *3 (N.D. Ga.

Aug. 10, 2007), adopted at *1 (quoting United States v. Barbour, 70 F.3d 580, 585

(11th Cir. 1995)).  See also Moran v. Burbine, 475 U.S. 412, 421 (1986); Edwards v.

Arizona, 451 U.S. 477, 482 (1981); Fare v. Michael C., 442 U.S. 707, 725 (1979);

Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).  "No single factor is necessarily

determinative of the issue whether a defendant knowingly and intelligently waived

his rights but the court must engage in a fact-specific inquiry based on all of the

circumstances."  Patterson, 2007 WL 2331080, at *3.  However, an express oral or

written waiver of Miranda is strong proof of the validity of the waiver.  United

States v. Stephens, 202 F. Supp. 2d 1361, 1370 (N.D. Ga. 2002).  To find a waiver

involuntary, "coercive police activity is a necessary predicate."  Connelly, 479 U.S.

at 167.

    After Degaule was detained, Officer Seeton advised him of his Miranda rights

by reading the rights from a DEA-13 Advice of Rights and Waiver Form.  [Doc. 248

at 27, 65]; (Degaule Gov. Ex. 5; Degaule Gov. Ex. 37 at 15). Degaule acknowledged

that he understood his rights, initialed each of the five rights on the form, agreed to

waive them by signing the waiver portion of the form, and indicated that he was

willing to speak with the agents.[50]  (Degaule Gov. Ex. 5; Degaule Gov. Ex. 37 at 15,

18); [Doc. 248 at 27-28, 65-66].  After Degaule waived his rights, Officer Seeton, along

with Officer Lucas, Agent Norton, and Sup. Robinson, proceeded to question

Degaule who made certain incriminating statements that he now moves to suppress.

[Docs. 206 & 273].

   Degaule contends that his waiver was not voluntary because the agents

"promised [him] that they would fill out the forms for him if he would waive his

Fifth Amendment rights and speak to them," but that the "forms were never

---

[50] When Officer Seeton initially attempted to advise Degaule of his <u>Miranda</u> rights, Degaule interrupted and told Officer Seeton that he needed to fill out the questionnaire Degaule provided him before they got started. (Degaule Gov. Ex. 37 at 13).  Agent Norton advised Degaule that the documents relating to his sovereign status had no impact on what was happening, that they were going to treat him like any other person in the country legally, that they were legally obligated to read him rights prior to speaking to him, and that they wanted to make sure he understood what was taking place.  (<u>Id.</u> at 14).  In response, Degaule pointed out that the questionnaire stated that in order for him to speak with the agents, the questions needed to be answered.  (<u>Id.</u> at 15).  Agent Norton again advised Degaule that they would look through the questions to see if it affected anything, but that they were going to move forward and advise him of his <u>Miranda</u> rights.  (<u>Id.</u>).  After Officer Seeton read Degaule his rights, Degaule again inquired as to whether the agents were going to acknowledge his documents.  (<u>Id.</u> at 16).  After a short discussion, Agent Norton advised Degaule that he would fill it out as they were "going through the process," and Officer Seeton also advised Degaule that if he wanted to ask him any of the questions on the questionnaire, Officer Seeton had no problem answering them for him.  (<u>Id.</u> at 16-17).  Thereafter, Officer Seeton again asked Degaule to read and initial that he understood his rights because he wanted it to be "crystal clear" that Degaule understood his <u>Miranda</u> rights.  (<u>Id.</u> at 17-18); <u>see also</u> [Doc. 248 at 27-28, 65].

completed" and that the agents therefore used trickery and deception by making a promise in exchange for his waiver that they never intended to fulfill.[51] [Doc. 273 at 27-28]. In <u>Miranda</u>, the Supreme Court held that "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." 384 U.S. at 476. However, "a valid waiver does not require that an individual be informed of all information 'useful' in making his decision or all information that 'might . . . affec[t] his decision to confess.'" <u>Colorado v. Spring</u>, 479 U.S. 564, 576 (1987) (quoting <u>Moran</u>, 475 U.S. at 422) (alterations in original). "Nor does the Constitution require the police to 'supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or standby his rights.'" <u>Kasper v. Estep</u>, Civil Action No. 05-cv-00973-WDM-MEH, 2007 WL 1834174, at *17 (D. Colo. June 25, 2007), adopted at *4 (quoting <u>Moran</u>, 475 U.S. at 422).

The Eleventh Circuit and other courts have held that "[t]rickery does not make it impossible *per se* to find that a defendant voluntarily waived his rights." <u>United States v. Anderson</u>, 929 F.2d 96, 99 (2d Cir. 1991); <u>United States v. Farley</u>, 607

---

[51] However, as noted earlier, at the hearing on the motion to reopen the record, the government proffered that Agent Norton began to fill out the questionnaire, but he did not complete it because some questions called for personal information, such as his residence address, and he left the partially completed questionnaire at Degaule's residence. [Doc. 291].

F.3d 1294, 1331 (11th Cir. 2010); United States v. Castaneda-Castaneda, 729 F.2d 1360, 1363 (11th Cir. 1984) ("the police's use of a trick alone will not render a confession involuntary."). Instead, an allegation that police deception or trickery invalidated a waiver of rights must be evaluated within the totality of the circumstances of the interrogation. United States v. Middleton, 245 Fed. App. 867, 871 (11th Cir. 2007) (per curiam) (unpublished). See also United States v. Grossman, 233 Fed. App. 963, 967 (11th Cir. 2007) (per curiam) (unpublished).

"[C]ourts have found waivers to be voluntary even in cases where officers employed deceitful tactics." Soffar v. Cockrell, 300 F.3d 588, 596 (5th Cir. 2002) (en banc). See also Spring, 479 U.S. at 575-77; United States v. Tapp, 812 F.2d 177, 179 (5th Cir. 1987). "[T]rickery or deceit is only prohibited to the extent it deprives the suspect 'of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" Soffar, 300 F.3d at 596 (quoting Moran, 475 U.S. at 424). See also Farley, 607 F.3d at 1327. "Of course, trickery can sink to the level of coercion, but this is a relatively rare phenomenon." United States v. Flemmi, 225 F.3d 78, 91 n.5 (1st Cir. 2000). "Generally, courts have held statements involuntary because of police trickery only when other aggravating circumstances were also present." Farley, 607 F.3d at 1328 (citing Castaneda-Castaneda, 729 F.2d at 1363). For example, "statements have been held involuntary where the deception

took the form of a coercive threat . . . or where the deception goes directly to the nature of the suspect's rights and the consequences of waiving them." Id. at 1328-29 (citations omitted).

In this case, Degaule asserts that he was presented the Advice of Rights and Waiver Form to read, initial, and sign and that it was only after the agents agreed to fill out his questionnaire that he agreed to waive his rights. Degaule further asserts that because several of the questions on the questionnaire "indirectly invoke or at least ask for explanation of certain Fifth Amendment rights under the U.S. Constitution,"[52] the agents' failure to answer the questions, which he contends "could clearly have impacted his willingness to waive the rights inquired about," renders his waiver involuntary. [Doc. 273 at 28-30]. However, "[t]he issue is not . . . whether the police used tricks or deceit, but whether tricks or deceit led a suspect

---

[52] At the hearing on the motion to reopen the record, [Doc. 291], Degaule argued that he invoked his right to remain silent by presenting the questionnaire and telling the agents that it had to be completed before he could answer any questions. However, the invocation of silence must be unambiguous, Medina v. Singletary, 59 F.3d 1095, 1100 (11th Cir. 1995), and Degaule's conduct was not. Instead of invoking his right to remain silent, Degaule indicated he was willing to talk to the agents, but he initially said the questionnaire had to be completed before he could answer their questions. However, after being advised of his rights, Degaule agreed to proceed while Agent Norton completed the questionnaire. Thus, Degaule did not unambiguously invoke his right to remain silent, nor did he insist that the questionnaire be completed as a condition precedent to waiving his rights since he agreed that Agent Norton could complete the questionnaire while they were going through the process, and Degaule initialed and signed the waiver form and proceeded with the interview without the questionnaire having been completed.

to believe that he could speak without consequences . . . or whether they undermined his ability to make a rationale choice about confessing . . . ." United States v. McFarland, 424 F. Supp. 2d 427, 436-37 (N.D.N.Y. 2006) (citations omitted).

"[O]ne who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled." Farley, 607 F.3d at 1327 (internal marks and citation omitted). Indeed, "*Miranda* requires the police to inform a suspect, without qualification, that *anything* he says may be used against him," which "conveys to a suspect the nature of his constitutional privilege and the consequences of abandoning it." Id. (internal marks and citations omitted). Here, while answering the questionnaire may have provided some additional information regarding Degaule's rights, his waiver was valid because his "decision to speak was made with full awareness and comprehension of all the information *Miranda* requires the police to convey." Id. at 1328 (internal marks and citation omitted). "The 'Advice of Rights' form, which [Degaule] both read for himself and had read out loud to him before he initialed and signed it, conveyed in clear language each of the warnings required by *Miranda*," and the agents did nothing to contradict those warnings or to prevent him "from understanding the nature of his rights and the legal consequences of waiving them."[53] Id. at 1328-29 (citation omitted). Indeed,

---

[53] Degaule suggests that because Officer Seeton advised him that initialing beside each right on the Advice of Rights form simply meant that he was

"[t]here are few more sobering experiences than being asked to read and execute a waiver of one's constitutional rights prior to questioning by agents . . . ."  United States v. Shafer, 384 F. Supp. 491, 493-94 (N.D. Ohio 1974).  "There is nothing to

---

acknowledging that he understood them, that he did not understand the consequences of signing the waiver portion of the form.  [Doc. 273 at 6]; see also (Degaule Gov. Ex. 37 at 17).  Officer Seeton's statement, however, "cannot be viewed in isolation," but rather "the court must consider everything that the [agents] said before [Degaule] signed the waiver form."  United States v. Hicks, 631 F. Supp. 2d 725, 742 (E.D.N.C. 2009) (finding statement by officer that "[y]ou're not signing your rights away. You're signing . . . to say that you're willing to talk to us," not misleading when viewed in the totality of the circumstances surrounding the waiver).  Here, Degaule read the form for himself and had it read aloud to him, and the form clearly states, "I have read or . . . someone has read to me this advice of rights and I understand what my rights are.  At this time, I am willing to freely and voluntarily answer questions without a lawyer present."  (Degaule Gov. Ex. 5).  Degaule confirmed that he was willing to answer questions, and also signed the waiver portion of the form by placing a postage stamp on the signature line and signing his name over the stamp.  (Id.; Degaule Gov. Ex. 37 at 16, 18).  Thus, the totality of the circumstances here do not suggest that Degaule did not understand the consequences of waiving his rights.  Furthermore, even if this statement was considered misleading, "that does not end the Court's inquiry as to whether [Degaule's] waiver was involuntary."  Hicks, 631 F. Supp. 2d at 742 (citations omitted).  "Instead, the Court must determine whether the statement was 'so manipulative or coercive that [it] deprived [Degaule] of his ability to make an unconstrained, autonomous decision to' waive his rights."  Id. (quoting United States v. Walton, 10 F.3d 1024, 1030 (4th Cir. 1993)) (first alteration in original).  "Again, the focus of [the] inquiry is on the totality of the circumstances," United States v. Giampa, 904 F. Supp. 235, 275 (D.N.J. 1995) (internal marks and citations omitted), and the totality of the circumstances here do not suggest that Officer Seeton's statement in any way affected Degaule's ability to make an autonomous decision to waive his rights.

indicate that [Degaule] was unsure of his rights or needed them clarified,"[54] and he "was not deceived about the nature of his rights and the consequences of abandoning them."  Farley, 607 F.3d at 1330 (internal marks and citation omitted). See also United States v. Deal, No. 3:08-cr-368-J-34JRK, 2009 WL 5386061, at *16 (M.D. Fla. July 29, 2009), adopted in part by 2010 WL 148458, at *1 (M.D. Fla. Jan. 12, 2010); Middleton, 245 Fed. App. at 872 (finding that since the defendant was read his Miranda rights and was aware of his rights and the consequences of the decision to abandon them, the totality of the circumstances indicated that the defendant knowingly and voluntarily waived his Miranda rights).

The totality of the circumstances here indicate that Degaule voluntarily, knowingly, and intelligently waived his rights.  Degaule was read his Miranda rights and was provided the opportunity to read them himself.  [Doc. 248 at 27-28,

---

[54] Degaule argues that certain information requested by the questionnaire, including questions 10, 14, 17, and 18, pertained to the exercise of his Fifth Amendment rights, and the agents' failure to answer these questions rendered his waiver invalid.  However, as noted earlier, Degaule did not require the agents to answer the questions before waiving his rights as he agreed that Agent Norton could complete the questionnaire during the process and Degaule then executed the waiver and began answering questions.  Moreover, Officer Seeton specifically offered Degaule the opportunity to ask him any of the questions on the questionnaire before executing the waiver, but Degaule did not ask Officer Seeton any questions or seek clarification of his rights.  (Degaule Gov. Ex. 37 at 16-17).  In fact, after Officer Seeton offered to answer any of the questions, he asked Degaule to again read the waiver of rights form and initial each right so that he was "crystal clear" and understood his rights. (Id.).

65-66]; (Degaule Gov. Ex. 37 at 15, 17-18; Degaule Gov. Ex. 5).  Officer Seeton clearly

advised Degaule of his right to remain silent and to have counsel present, and

warned him that anything he said could be used against him in court.  (Degaule

Gov. Ex. 37 at 15; Degaule Gov. Ex. 5).  Degaule then waived those rights by signing

a written waiver and proceeded to make incriminating statements.  [Doc. 248 at 27-

28, 65-66]; (Degaule Gov. Ex. 37 at 17-18; Degaule Gov. Ex. 5).  There is no evidence

that the agents threatened Degaule, and his mental and physical status at the time

of the interrogation did not result in any misunderstanding of his rights.  [Doc. 248

at 28-30, 46].[55]  Degaule did not ask for clarification, stop the interview, request the

---

[55] Degaule suggests that the agents threatened him by repeatedly advising him
that he was going to jail that night, that it would help him to cooperate, and that his
wife's medical practice could be impacted as a result of this investigation.  [Doc. 206
at 12-13].  However, "[a]n official who encourages cooperation with the government
and who informs the defendant of realistically expected penalties for cooperation
and/or non-cooperation does not offer an illegal inducement."   United States v.
Myers, Criminal File No. 1:08-CR-169-TWT, 2009 WL 579389, at *6 (N.D. Ga. Mar.
5, 2009), adopted at *1 (citing United States v. Mendoza-Cecelia, 963 F.2d 1467, 1475
(11th Cir. 1992), abrogated on other grounds, Coleman v. Singletary, 30 F.3d 1420
(11th Cir. 1994) ("finding that customs official's statements that 'if you do not
cooperate with us, ten years can be a long time in jail,' 'anything can happen,' and
'something can happen to your family' was not coercive)).  See also United States v.
Johnson, 379 Fed. App. 964, 968 (11th Cir. 2010) (per curiam) (unpublished); United
States v. Nash, 910 F.2d 749, 752-53 (11th Cir. 1990); United States v. Benson, No.
5:07-CR-19 (WDO), 2007 WL 1812638, at *4 (M.D. Ga. June 19, 2007).  Here, the
agents' statements "did nothing more than advise [Degaule] of the realistic
consequences of his actions and urge his cooperation because it may be helpful to
him or his [wife]."  Myers, 2009 WL 579389, at *6.  Accordingly, the Court hereby
rejects Degaule's argument in this regard.

presence of counsel, or otherwise indicate in any way that he did not understand his

rights or the consequences of his waiver.  [Id. at31, 38, 43].[56]

---

[56] Although Degaule said, "Do I call my attorney now?" near the conclusion of the interview, (Degaule Gov. Ex. 37 at 159), "[t]o invoke the right to counsel, a suspect 'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'"  United States v. Turner, No. CR 07-00604 MMM, 2008 WL 4820997, at *9 (C.D. Cal. Oct. 27, 2008) (internal marks and citations omitted). See also Davis v. United States, 512 U.S. 452, 459-62 (1994).  Thus, "[i]nvocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'"  Davis, 512 U.S. at 459 (quoting McNeil v. Wisconsin, 501 U.S. 171, 178 (1991)).  The Supreme Court has stated that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning."  Id. (emphasis in original).  That is, "[a] defendant who wants an attorney reasonably can be expected to take the simple expedient of saying so directly to a custodial officer.  If he does not take that step, he has not made the unequivocal request for counsel that Davis requires, and Davis dictates that the officers have no obligation to refrain from questioning him."  Martin v. Evans, No. ED CV 04-0210 PSG (FMO), 2008 WL 724720, at *22 (C.D. Cal. Mar. 12, 2008).  Therefore, "'[u]nless the suspect actually requests an attorney, questioning may continue.'"  United States v. Meador, No. 1:06 CR 134 CDP DDN, 2008 WL 4922001, at *16 (E.D. Mo. Jan. 7, 2008) (quoting Davis, 512 U.S. at 462); United States v. Straker, 596 F. Supp. 2d 80, 92 (D.D.C. 2009) ("It is true that the mere mention of an attorney and reference to advice from an attorney is not an unambiguous invocation of the right to counsel.").  Here, the credible evidence of record shows that Degaule merely mentioned calling his attorney near the end of the interview, but he never requested his presence or declined to answer questions in his absence, and this was insufficient to invoke Degaule's right to counsel.  See United States v. Tran, 171 Fed. App. 758, 761 (11th Cir. 2006) (per curiam) (unpublished) (finding that even if defendant made the request to retrieve his bankruptcy lawyer's business card, request was too ambiguous to constitute an invocation of right to counsel).  See also Davis, 512 U.S. at 459-62 (holding that "[m]aybe I should talk to a lawyer" was not an unambiguous invocation of the right to counsel); United States v. Peters, 435 F.3d 746, 751-52 (7th

This case does not present the type of "aggravating circumstances" where involuntariness has been found. <u>Middleton</u>, 245 Fed. App. at 872. The alleged deception of promising to fill out the questionnaire when in fact the agents did not do so did not contradict the <u>Miranda</u> warnings and did not deprive Degaule "of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." <u>Moran</u>, 475 U.S. at 424. Although the agents did not complete the questionnaire, they conveyed to Degaule the information required by <u>Miranda</u>, and the totality of the circumstances surrounding the interrogation demonstrate that Degaule was clearly advised of his rights and that anything he said could be used against him in court and that he voluntarily, knowingly, and intelligently waived his <u>Miranda</u> rights. Thus, it is

---

Cir. 2006) (observing that circuits have held that a statement such as "I might want to talk to an attorney" or "[d]o you think I need a lawyer?" or a request to call someone about possible representation is too ambiguous to constitute invocation of right to counsel); <u>Dormire v. Wilkinson</u>, 249 F.3d 801, 805 (8th Cir. 2001) (holding that "could I call my lawyer?" was not unequivocal); <u>United States v. Zamora</u>, 222 F.3d 756, 766 (10th Cir. 2000) (statement "I might want to talk to an attorney" not "an unequivocal request for counsel"); <u>United States v. Doe</u>, 170 F.3d 1162, 1166 (9th Cir. 1999) (continued questioning permissible because defendant's question, "What time will I see a lawyer?" was not clear statement invoking Miranda rights); <u>United States v. Ortiz</u>, 499 F. Supp. 2d 224, 232 (E.D.N.Y. 2007) (finding statement that defendant "thinks he wants to speak to a lawyer" insufficient to invoke Fifth Amendment rights). Accordingly, the Court finds that a reasonable officer under the circumstances would not recognize Degaule's statement as an unequivocal demand for the presence of counsel.

**RECOMMENDED** that Degaule's motion to suppress statements, [Doc. 206], be **DENIED**.

## C.   Motion to Reveal Confidential Informants, [Doc. 145]

Degaule has moved for disclosure of the names and location of confidential informants in this case. [Doc. 145]. Specifically, Degaule seeks to know the "precise number, identity and present location of informants or co-operating individuals utilized in the investigation of this case, who have actively participated in any of the acts forming the basis for the above-styled indictment." [Id. at 1]. Degaule also seeks the "specifics of any deals, payments, agreements or incentives which the government or any agent on the government's behalf has offered to said informants in exchange for their cooperation in this case." [Id.]. Degaule contends that the informants' participation in this case makes them more than a "mere tipster" and that disclosure of their identity is required under Roviaro v. United States, 353 U.S. 53 (1957). See [id. at 2-3].

In Roviaro, the Supreme Court recognized that the government has the privilege to withhold from disclosure the identity of its informants, but that this privilege is limited. 353 U.S. at 53. See also United States v. Flores, 572 F.3d 1254, 1265 (11th Cir. 2009) (per curiam). If disclosure of an informant's identity is "relevant and helpful to the defense of an accused, or is essential to a fair

determination of a cause, the privilege must give way." <u>Roviaro</u>, 353 U.S. at 60-61. In deciding whether disclosure is required, the Court must engage in a balancing test, taking into consideration "'the extent of the informant's participation in the criminal activity, the directness of the relationship between the defendant's asserted defense and the probable testimony of the informant, and the government's interest in nondisclosure.'" <u>United States v. Gutierrez</u>, 931 F.2d 1482, 1490 (11th Cir. 1991) (quoting <u>United States v. Tenorio-Angel</u>, 756 F.2d 1505, 1509 (11th Cir. 1985)).  The burden is on the defendant to establish that the <u>Roviaro</u> criteria in a particular case counsel in favor of disclosure by way of sufficiently specific demonstration of the relevancy and potential helpfulness of each of the informers' testimony.  <u>See Rugendorf v. United States</u>, 376 U.S. 528, 534-35 (1964); <u>United States v. Ayala</u>, 643 F.2d 244, 247 (5th Cir. 1981).  "Mere conjecture about the possible relevance of the informant's testimony is insufficient."  <u>United States v. Young</u>, 161 Fed. App. 922, 927 (11th Cir. 2006) (per curiam) (unpublished).  <u>See also</u> <u>United States v. Cantrell</u>, Criminal Action No. 1:10-Cr-00131-MHS, 2010 WL 3800684, at *2 (N.D. Ga. Sept. 23, 2010).

In cases where an informant is more than a mere tipster and may offer testimony that would materially support a defendant's defense, "[a]n *in camera* hearing may be helpful in balancing the interests of the [defendants] against those

of the government." United States v. Vann, 336 Fed. App. 944, 950 (11th Cir. 2009) (per curiam) (unpublished). See also Young, 161 Fed. App. at 927; United States v. Rutherford, 175 F.3d 899, 902-03 (11th Cir. 1999). Indeed, "[t]he evidence . . . shows that to strike the balance in this case[,] the district court must find out what the confidential informant's testimony would be." United States v. Panton, 846 F.2d 1335, 1336 (11th Cir. 1988).

Although the Court is not convinced that Degaule made a sufficiently specific demonstration of the relevancy and potential helpfulness of the informers' testimony to merit an *in camera* hearing, the Court did conduct an *in camera* conference with the government regarding the information sought by Degaule's motion, and upon consideration of the briefs and the information provided during this *in camera* proceeding, the Court concludes that the Rovario balancing factors favor non-disclosure of the confidential informants' identities at this time. Therefore, Degaule's motion for disclosure of the names and locations of the confidential informants, [Doc. 145], is hereby **DENIED**.

## II. CONCLUSION

For the foregoing reasons and cited authority, Degaule's motions for oral argument, [Doc. 279], and for the disclosure of confidential informants, [Doc. 145], are **DENIED**, and it is hereby **RECOMMENDED** that Degaule's motion to suppress

intercepted communications, [Doc. 144], and his motions to suppress evidence and statements, [Docs. 146 & 206], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 22nd day of April, 2011.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE